**LAW OFFICES OF RAHUL WANCHOO**
Attorneys for Plaintiff
Empire State Building
350 Fifth Avenue, 59th Floor
New York, New York 10118
Phone:  (646) 593-8866
Fax:     (212) 618-0213
E-mail: rwanchoo@wanchoolaw.com

09 CV 8481



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X

JAPUAL OIL AND MARITIME SERVICES PLC,

                Plaintiff,

          - against -

SARKU ENGINEERING SERVICES SDN BHD,

                Defendant.

------------------------------------------------------------X

09 CV ____ (___)

**VERIFIED COMPLAINT**

Plaintiff, JAPUAL OIL AND MARITIME SERVICES PLC., ("Plaintiff") by its attorneys, LAW OFFICES OF RAHUL WANCHOO, alleges on information and belief as follows:

### JURISDICTION AND VENUE

1.     This is a case of admiralty and maritime jurisdiction within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure, and within the admiralty and maritime jurisdiction of the United States and of this Honorable Court. This case also falls under the Court's admiralty and maritime jurisdiction pursuant to 28 U.S.C. §1333. Finally, this Court also has jurisdiction over this matter because the action also arises under the convention on the Recognition and Enforcement of Foreign Arbitral Awards, codified at 9 U.S.C. §201 *et. seq.* and/or the Federal Arbitration Act, 9 U.S.C. §1 *et. seq.*

2.    At all material times, Plaintiff was and now is a foreign corporation organized under and existing by virtue of the laws of Nigeria, and is the owner of the MORAYO ("Vessel"), a barge of about 4,723 deadweight tons capacity.

3.    Upon information and belief, at all material times, Defendant, SARKU ENGINEERING SERVICES SDN BHD ("Defendant") was and now is a foreign corporation organized under and existing by virtue of the laws of Malaysia, and is the charterer of the Vessel.

## FACTS GIVING RISE TO CLAIM

4.    On or about January 19, 2009, a time charter party ("Charter") was made between Plaintiff, as owner of the Vessel, and Defendant as charterer whereby Defendant chartered the Vessel for a minimum of three months for use of the Vessel at Mumbai High Oilfields of ONGC at West Coast India.

5.    The Charter provided that Defendant shall pay for the use and hire of the Vessel at the rate of $27,000.00 per day pro rata net to the Plaintiff, payable within 15 days from the date of invoice.  The Charter further provided that interest will be payable at 8% per annum on the charter hire overdue. A true and correct copy of the Charter dated January 19, 2009 is annexed hereto as **Exhibit 1**.

6.    On or about February 22, 2009, the Vessel was delivered to the Defendant at Mumbai, India. Plaintiff submitted various invoices to the Defendant periodically for the charter hire totaling $3,763,762.00 but has received only $1,611,140.00 to date.  Despite various reminders, Defendant has failed and/or neglected to pay the outstanding charter hire.

7.    On or about May 19, 2009, the Office of the Commissioner of Customs, Mumbai issued a summon to the Master of the Vessel ordering him to produce certain documents in respect of an inquiry being conducted with regard to the alleged importation of the Vessel and

2

its use thereafter by the Defendant at Bombay High. On May 23, 2009 the Vessel was detained

by the Customs Department at Mumbai.   Plaintiff requested the Defendant to secure the release

of the Vessel from detention, which the Defendant failed to do so.  Subsequently, Plaintiff made

an application to the High Court of Bombay to secure the Vessel's release.  On or about June

26, 2009, as per the order of the Bombay High Court, Plaintiff provided a Bank Guarantee in

the sum of Indian Rupees 5.5 million (equivalent to US$ 117,022.00) and a Bond for the value

of the Vessel and secured release of the Vessel. During the period of detention from May 23 to

June 26, 2009 Plaintiff incurred loss of charter hire in the amount $945,000.00 and expenses to

secure the release of the Vessel of about $500,000.00.

       8.    As a result of Defendant's aforesaid breach of its obligations under the Charter,

Plaintiff has been damaged in the amount of $2,594,346.38  as best can be presently calculated

as summarized below:

| | |
|---|---|
| Charter Hire | |
| February 22 – May 22, 2009 including Bunker Invoices | $2,587,762.00 |
| **Less**: Payment received from Defendant | $1,611,140.00 |
| Balance Charter Hire due for firm period | $  976,622.00 |
| | |
| Charter Hire for May 23 – June 26, 2009 (Detention period) | $  945,000.00 |
| | |
| Hire for standby tug May 21 – June 26 | $  111,000.00 |
| Interest on hire up to June 26 | $    61,724.38 |
| | |
| Other Expenses: | |
| Estimated Port Dues | $      6,507.00 |
| Bunker charges including bunker for stand by tug | $    48,493.00 |
| Remedial action cost, including legal charges, attendance and Travel expenses, communication and other misc. | $    445,000.00 |
| | |
| **Total** | **$2,594,346.38** |

A true and correct copy of Plaintiff's claim statement is annexed hereto as **Exhibit 2.** Despite

repeated reminders, Defendant has failed and/or neglected to pay the aforesaid amount.

9.    Under the terms of the Charter any and all dispute arising between the parties, the matter in dispute shall be referred to arbitration in Singapore subject to Singapore law. In addition to its damages, Plaintiff is also entitled to, in Singapore attorneys' fees and other taxable costs incurred or likely to be incurred in bringing this claim, which as best as can presently be calculated are $250,000.00 (See Winter Storm Shipping, Ltd. v. TPI, 310 F.3d 263, 265 (2d Cir. 2002), where the attachment that the Court of Appeals reinstated covered "an amount that includes interest and anticipated attorneys' and arbitrators' fees.").

10.    Plaintiff will commence arbitration proceedings against the Defendant in Singapore shortly. Arbitration of these disputes in Singapore arbitration may take 2 years. Plaintiff is entitled to and would receive interest at the present rate of 7.5% compounded quarterly on the principal claim from October 2009 to the completion of the arbitration or about $415,670.52.

11.    Plaintiff's total claim against Defendant for which it seeks security herein is $3,260,016.90 ($2,594,346.38  + $250,000.00 + $415,670.52).

12.    All and singular the premises are true and within the admiralty and maritime jurisdiction of this Honorable Court.

13.    The Defendant cannot be found within this District within the meaning of Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure.

14.    Our research shows that Defendant is a 35 year old company providing under water inspection services to vessels. Defendant provides services to various oil majors, gas and petro-chemical industries. A true and correct extract of Defendant's profile obtained from its website is annexed hereto as **Exhibit 3.** Defendant's commercial activities spanning the international markets are likely to entail  transactions in United States currency and the use of

4

electronic funds transfers passing through New York intermediary banks to effect or receive payments in that currency. Furthermore, Defendant has been paying the charter hire to the Plaintiff in US Dollars which payments are cleared through intermediary banks in New York. True and correct copies of Defendant's charter hire payments in US Dollars are annexed hereto as **Exhibit 4.** Accordingly, the Defendant has, or will have during the pendency of this action, tangible or intangible property within this District and subject to the jurisdiction of this Court, held in the hands of garnishees including, but not limited to, Bank of America, Bank of New York, Barclay's Bank, BNP Paribas, Citibank, Deutsche Bank Trust Co. Americas, HSBC Bank USA, JP Morgan Chase Bank, Standard Chartered Bank, UBS AG, and Wachovia Bank which is due and owing to the Plaintiff.

15.    Plaintiff seeks an order from this court directing the Clerk of Court to issue Process of Maritime Attachment and Garnishment pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims and also pursuant to the United States Arbitration Act, 9 U.S.C. §§ 1 and 8, attaching, *inter alia,* any property of the Defendant held by the aforesaid garnishees for the purpose of obtaining personal jurisdiction over the Defendant, and to secure the Plaintiff's claim as described above.

**WHEREFORE,** the Plaintiff prays the following:

A.    That process in due form of law issue against the Defendant, citing it to appear and answer under oath all the matters alleged in the Verified Complaint.

B.    That since the Defendant cannot be found within this District, this Court issue an Order directing the Clerk of the Court to issue Process of Maritime Attachment and Garnishment pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims and also pursuant to the United States Arbitration Act, 9 U.S.C. §§ 1 and 8, attaching all tangible or intangible property in whatever form or any other funds held by the aforesaid garnishees,

including, Bank of America, Bank of New York, Barclay's Bank, BNP Paribas, Citibank,

Deutsche Bank Trust Co. Americas, HSBC Bank USA, JP Morgan Chase Bank, Standard

Chartered Bank, UBS Bank, and Wachovia Bank, which is due and owing to the Plaintiff, in the

amount of $3,260,016.90 to secure the Plaintiff's claims, and that all persons claiming any

interest in the same be cited to appear and pursuant to Supplemental Admiralty Rule B answer

the matters alleged in the Verified Complaint.

      C.    That this Court recognize and confirm any arbitration award or judgment rendered

on Plaintiff's claims herein as a Judgment of this Court.

      D.    That this Court retain jurisdiction over this matter through the entry of any

judgment or award associated with any of the claims currently pending, or which may be

initiated in the future, including any appeals thereof; and

      E.    That this Court grant to Plaintiff such other and further relief as may be just and

proper in the circumstances.


Dated: New York, New York
      October 6, 2009

                    **LAW OFFICES OF RAHUL WANCHOO**
                    Attorneys for Plaintiff
                    JAPUAL OIL AND MARITIME SERVICES PLC.


                    By:    _Rahul Wanchoo_
                        Rahul Wanchoo (RW-8725)

## VERIFICATION

STATE OF NEW JERSEY)

                         ss.

COUNTY OF BERGEN   )

      I, Rahul Wanchoo, being duly sworn, deposes and says:

1.  I am an attorney at law and a member of the firm of Law Offices of Rahul

    Wanchoo, attorneys for Plaintiff.

2.  I have read the foregoing Verified Complaint and know the contents thereof and

    the same are true to the best of my knowledge, information and belief.

3.  I believe the matters to be true based on documents and information obtained

    from employees and representatives of the Plaintiff through its underwriters and

    attorneys.  The reason that this verification is made by deponent and not by the

    Plaintiff is because Plaintiff is a foreign corporation, whose officers are not in this

    district, and whose verification cannot be obtained within the time constraints

    presented by the circumstances of this case.


                                             _Rahul Wanchoo_

Sworn to and subscribed to
before me this 6th day of October, 2009.


_____
Notary Public

**HICKSON P. KORE**
**ID # 2377209**
**NOTARY PUBLIC OF NEW JERSEY**
**Commission Expires 8/26/2013**

# EXHIBIT 1

| 1. Place and date<br><br>**Kuala Lumpur, 19th January 2009** | **UNIFORM TIME CHARTER PARTY**<br>**FOR OFFSHORE SERVICE VESSELS**<br>**CODE NAME: "SUPPLYTIME 89"** |
|---|---|

<strong>PART I</strong>

| 2. Owners/Place of business (full style, address and telex no.) (Cl. 1(a))<br>JAPUAL OIL AND MARITIME SERVICES PLC<br>Plot 39 Eastern Bypass ,<br>Marine Base<br>PO Box 12932,<br>Port Harcourt<br>Nigeria<br>Tel: 00234 84 231622 | 3. Charterers/Place of business (full style, address and telefax no.) (Cl. 1(a))<br><br>SARKU ENGINEERING SERVICES SDN BHD<br>2nd Floor,Lot 806,Block 4,Bangunan Slipway MCLD<br>Piasau Industrial Estate,<br>98008 Miri,Sarawak, Malaysia<br>Tel: (085) 661122<br>Fax: (085) 661133 | |
|---|---|---|
| 4. Vessel's name (Cl. 1(a))<br><br>**"Morayo"** | 5. Date of delivery (Cl. 2(a))<br><br>**29th January to 5th February 2009** | 6. cancelling date (Cl. 2(a) and (c))<br><br>**9th February 2009** |
| 7. Port or place of delivery (Cl.2 (a))<br><br><br>**Mumbai** | 8. Port or place of redelivery/notice of redelivery (Cl. 2(d)) | |
| | (i)Port or place of redelivery<br>**Mumbai** | |
| | (ii)Number of days' notice of redelivery<br>**7 days** | |
| 9. Period of hire (Cl.1(a))<br><br><br>**Firm and Minimum 3 months.**<br>**Weekly extensions to be mutually agreed.** | 10. Extension of period of hire (optional) (Cl. 1(b)) | |
| | (i)Period of extension<br>**As box 9.** | |
| | (ii) Advance notice for declaration of option (days)<br>**15 days** | |
| 11. Automatic extension period to complete voyage or well (Cl.1(c)) | 12. Mobilisation charge (lump sum and when due) (Cl. 2(b)(I)) | |
| (i)Voyage or well (state which)<br>**N/A** | (i)Lump sum<br><br>**N/A** | |
| (ii)Maximum extension period (state number of days)<br>**N/A** | (ii)When due<br><br>**N/A** | |
| | 13. Port or place of mobilisation (Cl. 2(b)(I))<br><br>**N/A** | |
| 14. Early termination of charter (state amount of hire payable) (Cl. 26(a))<br><br><br>**Charter Hire for remaining firm days. In case of extension,**<br>**remaining extended days.** | 15. Number of days' notice of early termination (Cl. 26(a))<br><br><br>**7 days** | 16. Demobilisation charge (lump sum) (Cl. 2(e) and Cl. 26(a))<br><br><br>**N/A** |
| 17. Area of operation (Cl. 5(a))<br><br><br>**Mumbai High Oilfields of ONGC at West Coast India.** | 18. Employment of vessel restricted to (state nature of service(s)) (Cl. 5(a))<br><br><br>**Accommodation with total 180 berths to support refurbishment**<br>**and painting of offshore platforms and always within the**<br>**natural capabilities and capacities of the vessel and crew and**<br>**safe operating parameter.** | |

(continued)



(continued)      "SUPPLYTIME 89" Uniform Time Charter Party for Offshore Service Vessels      PART I

| | |
|---|---|
| 19. Charter hire (state rate and currency) (Cl. 10(a) and (d))<br>US$ 27,000 per day<br>(net to the Owners and excluding Malaysian and Indian withholding taxes); Fuel / Lubes / Water, port charges, local agent's dues, All taxes, VAT (India), custom/import duties, permits (including importation/exportation permits, where applicable), licenses. If applicable VAT will be invoiced separately and is for settlement by Charterers in addition to the Quoted day. ONGC passes for the crew and permission for the barge to go to oilfields will be to charterers account. | 20. Extension hire (if agreed, state rate) (Cl. 10(b))<br><br>Same as box No. 19. |
| 21. Invoicing for hire and other payments (Cl. 10(d | 22. Payments (state mode and place of payment; also state beneficiary and bank account) (Cl. 10(e)) |
| (i)state whether to be issued in advance or arrears<br>Invoicing every 15 days in advance | Standard Chartered Bank,<br>Lagos, Nigeria<br>A/c: USD00117062000<br>Beneficiary: JAPAUL OIL & MARITIME SERVICES PLC.<br>USD ABA A/c. 026002561 |
| (ii)state to whom to be issued if addressee other than stated in<br>N/A | CORRESPONDENT BANK<br>Standard Chartered Bank NY<br>1, Madison Avenue, New York, 10010-3603 |
| (iii)state to whom to be issued if addressee other than stated in<br>Box 3<br>N/A | Swift Code: SCBLUS33<br>Beneficiary Bank A/c: 3582088704001 |

| | | | |
|---|---|---|---|
| 23. Payment of hire, bunker invoices and disbursements for Charterers' account (state maximum number of days) (Cl.10(e))<br><br>15 days from the date of invoice. | | 24. Interest rate payable (Cl. 10(e))<br><br>8 % per annum | 25. Maximum audit period (Cl. 10(f))<br><br>36 months |
| 26. Meals (state rate agreed) (Cl. 5(c)(I))<br><br>Not applicable | 27.Accommodation (state rate agreed) (Cl. 5(c)(I))<br><br>Not applicable | 28. Mutual Waiver of Recourse (optional, state whether applicable) (Cl. 12(f))<br><br>Applicable | |
| 29. Sublet (state amount of daily increment to charter hire) (Cl. 17(b))<br><br>N/A | | 30. War (state name of countries) (Cl. 19(e))<br><br>N/A | |
| 31. General average (place of settlement – only to be filled in if other than London) (Cl. 21)<br><br>N/A | | 32. Breakdown (state period) (Cl. 26(b) (v))<br><br>N/A | |
| 33. Law and arbitration (state Cl. 31(a) or 31(b) or 31(c), as agreed; if 31(c) agreed also state place of arbitration) (Cl. 31)<br>Singapore | | 34. Numbers of additional clauses covering special provisions, if agreed<br><br>Five | |
| 35. Names and addresses for notices and other communications required to be given by the Owners (Cl. 28)<br>Attn: Bruce Graham Cox<br>Sarku Engineering Services Sdn BHD<br>Sagar Uday, Plot F-3, Behind CIDCO Bhavan, Belapur<br>Mumbai 400614<br>Fax: +91 (022) 27578219<br>Email: brucecox@sarku.com.my | | 36. Names and addresses for notices and other communications required to be given by the Charterers (Cl.28)<br>Attn: Sunil Chaudhary<br>C.S.Offshore FZE<br>P.O.Box Box 32560 Dubai<br>Fax: +9714-3939536.<br>E mail: sunil@cs-offshore.com | |

It is mutually agreed that this Contract shall be performed subject to the conditions contained in the Charter consisting of PART I, including additional clauses if any agreed and stated in Box 34, and PART II as well as ANNEX "A" and ANNEX "B" as annexed to this Charter. In the event of a conflict of conditions, the provisions of PART I shall prevail over those of PART II and ANNEX "A" and ANNEX "B" to the extent of such conflict but no further. ANNEX "C" as annexed to this Charter is optional and shall only apply if expressly agreed and stated in Box 28.

| Signature (Owners) | Signature (Charterers) |
|---|---|
| S B 1 | CEO |





**ANNEX "A" to Uniform Time Charter Party for Offshore Service Vessels**
**Code Name: "SUPPLYTIME 89" – dated 17th December 2008**

VESSEL SPECIFICATION – (refer Vessel Specification attached)

1.    General

(a) Owner:    Name: JAPAUL OIL AND MARITIME SERVICES PLC
        Address: PLOT 39, EASTERN BYPASS, MARINE BASE, PO BOX NO. 12932, PORT HARCOURT, NIGERIA

(b) Operator:    Name: C.S. OFFSHORE FZE
        Address: DUBAI MARITIME CITY, PO BOX NO. 32560, DUBAI, UAE

(c) Vessel's Name    MORAYO    Builder: JURONG SHIPYARD

(d) Year Built:    1980

(e) Type:    BARGE

(f) Classification and Society:    INTERNATIONAL REGISTER OF SHIPPING
        INDIAN REGISTER OF SHIPPING
(g) Flag:    SIERRA LEONE

(h) Date of next scheduled drydocking:    2012

2.    Performance

(a)  Certified Bollard Pull (Tonnes)    N.A.

(b)  Speed/Consumption (Non-Towing)    N.A.

(Approx. Daily Fuel Consumption)    N.A.
(Fair Weather)

Max Speed:    Kts (app) N.A.    Tonnes

Service Speed:  Kts (app) N.A.    Tonnes

Standby (main engines secured) N.A.    Tonnes

(c)    Approx. Towing/Working Fuel Consumption

Engine Power    N.A    100%    Tonnes

(c)  Type(s) and Grade(s) of Fuel Used:    HSD

3.    Dimensions and Capacities/Discharge Rates:

(a)    L.O.A. (m): 74    Breath (m): 25    Depth (m): 4.88

        Max Draught (m): 3.92

(b)  Deadweight (metric tons):    4723

Discharge Rate  N.A

(c) * Cargo Fuel max: 325 TONNES
(d) * Drill Water max (m3): N.A

(e) Potable Water: 900 TONNES

(f) Dry Bulk (m3/cu.ft): N.A.

(g) Liquid Mud (m3/barrels): N.A.

State type of recirculation system i.e
Mechanical agitation, centrifugal pumps etc.



(h) Cargo Deck Area (m2): 700 Sq. mtrs    Capacity (m.t.): N.A.

(i)    Heavy Weight Brine (m3/barrels):    N.A

4.    Machinery

(a)    BHP Main Engines:    N.A

(b)    Engine Builder:    N.A

(c)    Number of Engines and Type:    N.A

(d)    Generators:    3 x GM DETROIT DIESEL

(e)    Stabilisers:

(f)    Bow Thruster(s):    N.A

(g)    Stern Thruster(s):    N.A

(h)    Propellers/Rudders:    N.A

(i)    Number and Pressure Rating of Bulk Compressors: N.A

(j)    Fuel Oil Metering System:    N.A

5.    Towing and Anchor Handling Equipment

(a) (i) Stern Roller (Dimensions): N.A

(ii) Anchor Handling/Towing Winch:    N.A

(iii) Rig Chain Locker Capacity (Linear feet of 3 in. Chain): N.A

(iv) Tugger Winches:    N.A
(v) Chain Stopper Make and Type:    N.A

(b) (i) Towing Wire:    N.A

(ii) Spare Towing Wire:  N.A

(iii) Work Wire:  N.A

(iv) Other Anchor Handling Equipment
(e.g Pelican Hooks, Shackles, Stretchers etc): N.A

6.    Radio and Navigation Equipment

(a)    Radios

Single Side Band: SAILOR

VHF: SAILOR

Satcom: N.A

(b) Electronic Navigation Equipment: N.A

(c)    Gyro: N.A

(d)    Radar: N.A

(e)    Autopilot: N.A

(f)    Depth Sounder: N.A

7.    Fire Fighting Equipment

(a)  Class (FF1, FF2, FF3, other): N.A



(b)  Fixed:

(c)  Portable:

8.    Accomodation: TOTAL 180 PEOPLE

9.    Galley

(a)  Freezer Space (m3): 15M3

(b)  Cooler (m3): 13M3

10  Additional Equipment

(a)  Mooring Equipment: N.A

(b)  Joystick: N.A

(c)  Other: Manitowac Crawler Crane.



ANNEX "B" to Uniform Time Charter Party for Offshore Service Vessels
Code Name "SUPPLYTIME 89" – dated 17ᵗʰ December 2008

---

## INSURANCE

Insurance policies (as applicable) to be procured and maintained by the Owners under Clause 14:

(1) *Marine Hull Insurance.-* Hull and Machinery Insurance shall be provided with limits equal to those normally carried by the Owners for the Vessel.

(2) *Protection and Indemnity (Marine Liability) Insurance. –* Protection and Indemnity or Marine Liability insurance shall be provided for the Vessel with a limit equal to the value under paragraph 1 above or U.S. $5 million, whichever is greater, and shall include but not be limited to coverage forcrew liability, third party bodily injury and property damage liability, including collision liability, towers liability (unless carried elsewhere).

(3) ~~*General Third Party Liability Insurance.* Coverage shall be for:~~
~~Bodily Injury ————————————— per person~~
~~Property Damage ——————————— per occurrence.~~

(4) ~~*Workmen's Compensation and Employer's Liability Insurance for Employees.* Covering non-employees for statutory benefits as set out and required by local law in area of operation or area in which the Owners may become legally obliged to pay benefits.~~

(5) ~~*Comprehensive General Automobile Liability Insurance.* Covering all owned, hired and non-owned vehicles; Coverage shall be for:~~
~~Bodily Injury ———— According to the local law.~~
~~Property Damage —— In an amount equivalent to single limit per occurrence.~~

(6) ~~Such other insurances as may be agreed.~~



**"SUPPLYTIME 89" Uniform Time Charter Party for Offshore Service Vessels**   **PART II**

### 1. Period

(a) The Owners stated in Box 2 let and the Charterers stated in Box 3 hire the Vessel named in Box 4, as specified in ANNEX "A" (hereinafter referred to as "the Vessel"), for the period as stated in Box 9 from the time the Vessel is delivered to the Charterers.

(b) Subject to Clause 10(b), the Charterers have the option to extend the Charter Period in direct continuation for the period stated in Box 10(i), but such an option must be declared in accordance with Box 10(ii).

(c) The Charter Period shall automatically be extended for the time required to complete the voyage or well (whichever is stated in Box 11(i)) in progress, such time not to exceed the period stated in Box 11(ii).

### 2. Delivery and Redelivery

(a) Delivery. - Subject to sub-clause (b) of this Clause the Vessel shall be delivered by the Owners free of cargo and with clean tanks at any time between the date stated in Box 5 and the date stated in Box 6 at the port or place stated in Box 7 where the Vessel can safely lie always afloat.

(b) Mobilisation. - (i) The Charterers shall pay a lump sum as stated in Box 12 without discount by way of mobilisation charge in consideration of the Owners giving delivery at the port or place stated in Box 7 The mobilisation charge shall not be affected by any change in the port or place of mobilisation from that stated in Box 13.

(ii) Should the Owners agree to the Vessel loading and transporting cargo and/or undertaking any other service for the Charterers en route to the port of delivery or from the port of redelivery, then all terms and conditions of this Charter Party shall apply to such loading and transporting and/or other service exactly as if performed during the Charter Period excepting only that any lump sum freight agreed in respect thereof shall be payable on attainment or commencement of the service as the case may be, the Vessel and/or goods lost or not lost.

(c) Cancelling. - If the Vessel is not delivered by midnight local time on the cancelling date stated in Box 6, the Charterers shall be entitled to cancel this Charter Party However, if despite the exercise of due diligence by the Owners, the Owners will be unable to deliver the Vessel by the cancelling Date, they may give notice in writing to the Charterers at any time prior to the delivery date as stated in Box 5, and shall state in such notice the date by which they will be able to deliver the Vessel, The Charterers may within 24 hours of receipt of such notice give notice in writing to the Owners cancelling this Charter Party, if the Charterers do not give such notice, then the later date specified in the Owners' notice shall be substituted for the cancelling date for all the purposes of this Charter Party. In the event the Charterers cancel the Charter Party, it shall terminate on terms that neither party shall be liable to the other for any losses incurred by reason of the non-delivery of the Vessel or the cancellation of the Charter Party.

(d) Redelivery. - The Vessel shall be redelivered on the expiration or earlier termination of this Charter Party free of cargo and with clean tanks at the port or place as stated in Box 8(i) or such other port or place as may be mutually agreed The Charterers shall give not less than the number of days notice in writing of their intention to redeliver the Vessel, as stated in Box 8(ii)

(e) Demobilisation. - The Charterers shall pay a lump sum without discount in the amount as stated in Box18 by way of demobilisation charge which amount shall be paid on the expiration or on earlier termination of this Charter Party.

### 3. Condition of Vessel

(a) The Owners undertake that at the date of delivery under this Charter Party the Vessel shall be of the description and classification as specified in ANNEX "A" attached hereto, and undertake to maintain the Vessel during the period of service under this Charter Party.

(b) The Owners shall before and at the date of delivery of the Vessel and throughout the Charter Period exercise due diligence to make and maintain the Vessel tight, staunch, strong in good order and condition and, without prejudice to the generality of the foregoing, in every way fit to operate effectively at all times for the services as stated in Clause 5.

### 4. Survey

The Owners and the Charterers shall jointly appoint an independent surveyor for the purpose of determining and agreeing in writing the condition of the Vessel, any anchor handling and towing equipment specified in Section 5 of ANNEX "A", and the quality and quantity of fuel, lubricants and water at the time of delivery and redelivery hereunder. The Owners and the Charterers shall jointly share the time and expense of such surveys.

### 5. Employment and Area of Operation

(a) The Vessel shall be employed in offshore activities which are lawful in accordance with the law of the place of the Vessel's flag and/or registration and of the place of operation, Such activities shall be restricted to the service(s) as stated in Box18, and to voyages between any port and safe port or place and any place or offshore unit where the Vessel can safely lie always afloat within the Area of Operation as stated in Box17 which shall always be within Institute Warranty Limits and which shall in no circumstances be exceeded without prior agreement and adjustment of the Hire and in accordance with such other terms as appropriate to be agreed; provided always that the Charterers do not warrant the safety of any such port or place or offshore unit but shall exercise due diligence in issuing their orders to the Vessel as if the Vessel were their own property and having regard to her capabilities and the nature of her employment, Unless otherwise agreed, the Vessel shall not be employed as a diving platform .

(b) Relevant permission and licences from responsible authorities for the Vessel to enter, work in and leave the Area of Operation shall be obtained by the Charterers and the Owners shall assist, if necessary, in every way possible to secure such permission and licences .

(c) The Vessel's Space.- The whole reach and burden and decks of the Vessel shall throughout the Charter Period be at the Charterers' disposal reserving proper and sufficient space for the Vessel's Master, Officers' Crew, tackle, apparel, furniture, provisions and stores, The Charterers shall be entitled to carry, so far as space is available and for their purposes in connection with their operations:

(i) Persons other than crew members, other than fare paying, and for such purposes to make use of the Vessel's available accommodation not being used on the voyage by the Vessel's Crew, The Owners shall provide suitable provisions and requisites for such persons for which the Charterers shall pay at the rate as stated in Box 26 per meal and at the rate as stated in Box 27 per day for the provision of bedding and services for persons using berth accommodation,

(ii) Lawful cargo whether carried on or under deck.

(iii) Explosives and dangerous cargo, whether in bulk or packaged, provided proper notification has been given and such cargo is marked and packed in accordance with the national regulations of the Vessel and/or the International Maritime Dangerous Goods Code and/or other pertinent regulations, Failing such proper notification, marking or packing the Charterers shall indemnify the Owners in respect of any loss, carriage or liability whatsoever and howsoever arising therefrom. The Charterers accept responsibility for any additional expenses (including reinstatement expenses) incurred by the Owners in relation to the carriage of explosives and dangerous cargo

(iv) Hazardous and noxious substances, subject to Clause 12(g), proper notification and any pertinent regulations

(e) Laying-up of Vessel. - The Charterers shall have the option of laying up the Vessel at an agreed safe port or place for all or any portion of the Charter Period in which case the Hire hereunder shall continue to be paid but, if the period of such lay-up exceeds 30 consecutive days there shall be credited against such Hire the amount which the Owners shall reasonably have saved by way of reduction in expenses and overheads as a result of the lay up of the Vessel .

### 6. Master and Crew

(a) (i) The Master shall carry out his duties promptly and the Vessel shall render all reasonable services within her capabilities by day and by night and at such times and on such schedules as the Charterers may reasonably require without any obligations of the Charterers to pay to the Owners or the Master, Officers or the Crew of the Vessel any excess of overtime payments The Charterers shall furnish the Master with all instructions and sailing directions and the Master and Engineer shall keep full and correct logs accessible to the Charterers or their agents.

(ii) The Master shall sign all documents as and in the form presented, the same, however, not to be Bills of Lading, but receipts which shall be non negotiable documents and shall be marked as such. The Charterers shall indemnify the Owners against all consequences and liabilities arising from the Master, Officers or agents signing, under the direction of the Charterers, those cargo documents or other documents inconsistent with this Charter Party or from any irregularity in the papers supplied by the Charterers or their agent.

(b) The Vessel's Crew if required by Charterers will connect and disconnect electric cables, fuel, water and pneumatic hoses when placed on board the Vessel in port as well as alongside the offshore units; will operate the machinery on board the Vessel for loading and unloading cargoes; and will hook and unhook cargo on board the Vessel for loading or discharging alongside offshore units if the port regulations or the seamen and/or labour unions do not permit the Crew of the Vessel to carry out any of this work, then the Charterers shall make, at their own expense, whatever other arrangements may be necessary, always under the direction of the Master.

(c) If the Charterers have reason to be dissatisfied with the conduct of the Master or any Officer or member of the Crew the Owners on receiving particulars of the complaint shall promptly investigate the matter and if the complaint proves to be well founded, the Owners shall as soon as reasonably possible make appropriate changes in the appointment.

(d) The entire operation, navigation, and management of the Vessel shall be in the exclusive control and command of the Owners, their Master, Officers and Crew, The Vessel will be operated and the services hereunder will be rendered as requested by the Charterers, subject always to the exclusive right of the Owners or the Master of the Vessel to determine whether operation of the Vessel may be safely undertaken. In the performance of the Charter Party, the Owners are deemed to be an independent contractor, the Charterers being concerned only with the results of the services performed.

### 7. Owners to Provide

(a) The Owners shall provide and pay for all provisions, wages and all other expenses of the Master, Officers and Crew; all maintenance and repair of the Vessel's hull, machinery and equipment as specified in ANNEX "A"; also, except as otherwise provided in this Charter Party, for all insurance on the Vessel, all dues and charges directly related to the Vessel's flag and/or registration, all deck, cabin and engineroom stores, cordage required for ordinary ships purposes mooring alongside in harbour, and all fumigation expenses and de-ratisation certificates. The Owners' obligations under this Clause extend to cover all liabilities for consular charges appertaining to the Master, Officers and Crew, customs or import duties arising at any time during the performance of this Charter Party in relation to the personal effects of the Master, Officers and Crew, and in relation to the stores, provisions and other matters as aforesaid which the Owners are to provide and/or pay for and the Owners shall refund to the Charterers any sums they or their agents may have paid or been compelled to pay in respect of such liability

(b) On delivery the Vessel shall be equipped, if appropriate with all required anchors , anchor water or chains at the Owners expense with any towing and/or anchor handling equipment if appropriate as specified in Section 5(a) of ANNEX "A", if during the Charter Period any such equipment becomes lost, damaged or unserviceable, other than as a result of the Owners, negligence, or as a result of ordinary fair wear and tear, the Charterers shall either provide, or direct the Owners to provide, an equivalent replacement at the Charterers' expense.

### 8.     Charterers to Provide

(a) While the Vessel is on hire the Charterers shall provide and pay for all fuel, lubricants, water dispersants, firefighting foam and transport thereof, port charges, pilotage and boatmen and canal steersman (whether compulsory or not), launch hire (unless incurred in connection with the Owners, business), light dues, tug assistance, canal, dock, harbour, tonnage and other dues and charges, agencies and commissions incurred on the Charterers' business, costs for security or other watchmen, and of quarantine (if occasioned by the nature of the cargo carried or the ports visited whilst employed under this Charter Party but not otherwise)

(b) At all times the Charterers shall provide and pay for the loading and unloading of cargoes so far as not done by the Vessel's crew, cleaning of cargo tanks, all necessary dunnage, supplies and shoring equipment for securing deck cargo, all cordage except as to be provided by the Owners, all ropes, slings and special runners (including bulk cargo discharge hoses) actually used for loading and discharging; heat gas required for the protection of cargo, and electricity used for offshore works, and shall reimburse the Owners for the actual cost of replacement of special mooring lines to offshore units, wires, nylon spring lines etc used for offshore works all hose connections and adaptors, and further, shall fit oxygen/acetylene bottles used for offshore works.

**"SUPPLYTIME 89" Uniform Time Charter Party for Offshore Service Vessels**   PART II

The Charterers shall pay for customs duties, all permits, import duties (including   204
costs involved in establishing temporary or permanent importation   205
bonds), and clearance expenses, both for the Vessel and/or equipment,   206
required for or arising out of Charterer's operations under this Charter Party.   207

**9. Bunkers**   208
Unless otherwise agreed, the Vessel shall be delivered with bunkers and   209
lubricants as on board and redelivered with sufficient bunkers to reach the   210
next bunkering stage on route to her next port of call. The Charterers upon   211
delivery and the Owners upon redelivery shall take over and pay for the   212
bunkers and lubricants on board at the prices prevailing at the times and   213
ports of delivery and redelivery.   214

**10. Hire and Payments**   215
(a) Hire - The Charterers shall pay Hire for the Vessel at the rate stated in Box   216
19 per day or pro rata for part thereof from the time that the Vessel is delivered   217
to the Charterers until the expiration or earlier termination of this Charter 2   218
Party.   219
(b) Extension Hire. - If the option to extend the Charter Period under Clause   220
l(c) is exercised, Hire for such extension shall, unless stated in Box 20, be   221
mutually agreed between the Owners and the Charterers.   222
(c) Adjustment of Hire. The rate of Hire shall be adjusted to reflect   223
documented changes, after the date of entering into the Charter Party or the   224
date of commencement of employment, whichever is earlier, in the Owner   225
costs arising from changes in the Charterers, requirements or regulations   226
governing the Vessel and/or its Crew or this Charter Party.   227
(d) Invoicing. - All invoices shall be issued in the contract currency stated in   228
Box 19. In respect of reimbursable expenses incurred in currencies other   229
than the contract currency, the rate of exchange into the contract currency   230
shall be that quoted by first Central Bank of the country of such other currency   231
as at the date of the Owners' invoice. Invoices covering Hire and any other   232
payments due shall be issued monthly as stated in Box 21(i) or at the   233
expiration or earlier termination of this Charter Party. Notwithstanding the   234
foregoing, bunkers and lubricants on board at delivery shall be invoiced at   235
the time of delivery.   236
(e) Payments. - Payments of Hire, bunker invoices and disbursements for the   237
Charterers' account shall be received within the number of days stated in Box   238
23 from the date of receipt of the invoice. Payment shall be made in the   239
contract currency in full without discount to the account stated in Box 22.   240
However any advances for disbursements made on behalf of and approved by   241
the Owners may be deducted from Hire due.   242
If payment is not received by the Owners within 5 10 banking days following the   243
due date the Owners are entitled to charge interest at the rate stated in Box24   244
on the amount outstanding from and including the due date until payment is   245
received.   246
Where an invoice is disputed, the Charterers shall in any event pay the   247
undisputed portion of the invoice but shall be entitled to withhold payment of   248
the disputed portion provided that such portion is reasonably disputed and   249
the Charterers specify such reason, interest will be chargeable at the rate   250
stated in Box 24 on such disputed amounts where resolved in favour of the   251
Owners. Should the Owners prove the validity of the disputed portion of the   252
invoice, balance payment shall be received by the Owners within 510 banking   253
days after the dispute is resolved. Should the Charterers, claim be valid, a   254
corrected invoice shall be issued by the Owners.   255
In default of payment as herein specified, the Owners may require the   256
Charterers to make payment of the amount due within 5 10 banking days of   257
receipt of notification from the Owners; failing which the Owners shall have   258
the right to withdraw the Vessel without prejudice to any claim the Owners   259
may have against the Charterers under this Charter Party.   260
While payment remains due the Owners shall be entitled to suspend the   261
performance of any and all of their obligations hereunder and shall have no   262
responsibility whatsoever for any consequences thereof, in respect of which   263
the Charterers hereby indemnify the Owners, and Hire shall continue to   264
accrue and any extra expenses resulting from such suspension shall be for   265
the Charterers' account.   266
(f) Audit - The Charterers shall have the right to appoint an independent   267
chartered accountant to audit the Owners, books directly related to work   268
performed under this Charter Party at any time after the conclusion of the   269
Charter Party, up to the expiry of the period stated in Box 25, to determine the   270
validity of the Owners' charges hereunder. The Owners undertake to make   271
their records available for such purposes at their principal place of business   272
during normal working hours. Any discrepancies discovered at payments   273
made shall be promptly resolved by invoice or credit as appropriate.   274

**11. Suspension of Hire**   275
(a) if as a result of any deficiency of Crew or of the Owners; stores, strike of   276
Master Officers and Crew, breakdown of machinery, damage to Hull or other   277
accidents to the Vessel, the Vessel is prevented from working, no Hire shall be   278
payable in respect of any time lost and any Hire paid in advance shall be   279
adjusted accordingly provided always however that Hire shall not cease in the   280
event of the Vessel being prevented from working as aforesaid as a result of   281
(i)   the carriage of cargo as noted in Clause (j)o(iii) and (vi);   282
(ii)   quarantine or risk of quarantine unless caused by the Master, Officers or   283
       Crew having communication with the shore of any infected area not in   284
       connection with the employment of the Vessel without the consent or the   285
       instructions of the Charterers;   286
(iii)   deviation from her Charter Party duties or exposure to abnormal risks at   287
       the request of the Charterers;   288
(iv)   detention in consequence of being driven into port or to anchorage   289
       through stress of weather or trading to shallow harbours or to river or   290
       ports with bars or suffering an accident to her cargo, when the expenses   291
       resulting from such detention shall be for the Charterers, account   292
       howsoever incurred.   293
(v)   detention or damage by ice;   294
(vi)   any act or omission of the Charterers, their servants or agents.   295
(b) _Liability for Vessel not Working_ - The Owners, liability for any loss,   296
damage or delay sustained by the Charterers as a result of the Vessel being   297
prevented from working by any cause whatsoever shall be limited to the   298
suspension of Hire.   299
(c) Maintenance and Drydocking - Notwithstanding sub-clause(a) hereof, the   300
Charterers shall grant the Owners a maximum of 24 hours on hire, which shall   301-
be cumulative, per month or pro rata for part of a month from the   302
commencement of the Charter Period for maintenance and repairs including   303
drydocking (hereinafter referred to as "maintenance allowance").   304
(d) The Vessel shall be drydocked at regular intervals but which shall be outside   
the charter period. The Charterers shall place the vessel at the owners disposal   

disposal clean of cargo, at a port (to be nominated by the Owners at a later date)   306
having facilities suitable to the Owners for the purpose of such drydocking.   306
(e) During reasonable voyage time taken in transits between such port and Area   307
of Operation the Vessel shall be on hire and such time shall not be counted   308
against the accumulated maintenance allowance.   309
(f) Hire shall be suspended during any time taken in maintenance repairs and   310
drydocking in excess of the accumulated maintenance allowance.   311
(g) Upon commencement of the Charter Period, the Owners agree to furnish the   312
Charterers with the Owners, proposed drydocking schedule and the   313
Charterers agree to make every reasonable effort to assist the Owners in   314
adhering to such predetermined drydocking schedule for the Vessel.   315
   316

**12. Liabilities and Indemnities**   317
(a) Owners. - Notwithstanding anything else contained in this Charter Party   318
excepting Clause 5(j)(ii),1(b),3(b),12(g),15(c)and 21,the Charterers shall   319
not be responsible for loss of or damage to the property of the Owners or of   320
their contractors and sub-contractors, including the Vessel, or for personal   321
injury or death of the employees of the Owners or of their contractors and   322
sub-contractors, arising out of or in any way connected with the performance   
of this Charter Party even if such loss, damage, injury or death is caused   323
wholly or partially by the act, neglect, or default of the Charterers, their   324
employees, contractors or sub contractors, and even if such loss, damage,   325
injury or death is caused whollyor partially by unseaworthiness of any vessel ;   326
and the Owners shall indemnify, protect, defend and hold harmless the   327
Charterers from any and against all claims, costs, expenses, actions,   328
proceedings, suits, demands and liabilities whatsoever arising out of or in   329
connection with such loss, damage, personal injury or death.   330
(b) Charterers - Notwithstanding anything else contained in this Charter   331
Party excepting Clause 21, the Owners shall not be responsible for loss of   332
damage to, or any liability arising out of anything towed by the Vessel, any   333
cargo laden upon or carried by the Vessel or her tow, the property of the   334
Charterers or of their contractors and sub contractors, including their   335
offshore units, or for personal injury or death of the employees of the   336
Charterers or of their contractors and sub-contractors (other than the Owners   337
and their contractors and sub-contractors) or of anyone on board anything   338
towed by the Vessel, arising out of or in any way connected with the   339
performance of this Charter Party even if such loss, damage, liability, injury   340
or death is caused wholly or partially by the act, neglect or default of the   341
Owners, their employees, contractors or sub contractors, and even if such   342
loss, damage, liability, injury or death is caused wholly or partially by the   343
unseaworthiness of any vessel; and the Charterers shall indemnify, protect,   344
defend and hold harmless the Owners from any and against all claims, costs,   345
expenses, actions, proceedings, suits, demands, and liabilities whatsoever   346
arising out of or in connection with such loss, damage, liability, personal   347
injury or death.   348
(c) Consequential Damages. - Neither party shall be liable to the other for and   349
each party hereby agrees to protect, defend and indemnify the other against   350
any consequential damages whatsoever arising out of or in connection with   351
the performance or non-performance of this Charter Party, including, butnot   352
limited to loss of use, loss of profits, shut in or loss of production and cost of   353
insurance   354
(d) Limitations - Nothing contained in this Charter Party shall be construed or   355
held to deprive the Owners or the Charterers, as against any person or party,   356
including his against each other of any right to claim limitation of liability   357
provided by any applicable law, statute or convention, save that nothing in   358
this Charter Party shall create any right to limit liability. Where the Owners or   359
the Charterers may seek an indemnity under the provisions of this Charter   360
Party or against each other in respect of a claim brought by a third party, the   361
Owners or the Charterers shall seek to limit their liability against such third   362
party.   363
(e) Himalaya Clause.- (i) All exceptions, exemptions, defences, immunities,   364
limitations of liability, indemnities, privileges and conditions granted or   365
provided by this Charter Party or by any applicable statute, rule or regulation   366
for the benefit of the Charterers shall also apply to and be for the benefit of the   367
Charterers, parent, affiliated, related and subsidiary companies; the   368
Charterers, contractors sub-contractors, clients, joint venturers and joint   369
interest owners (always with respect to the job or project for which the Vessel   370
is employed); their respective employees and their respective underwriters.   371
(ii) All exceptions, exemptions, defences, immunities, limitations of liability,   372
indemnities, privileges and conditions granted or provided by this Charter   373
Party or by any applicable statute rule or regulation for the benefit of the   374
Owners shall also apply to and be for the benefit of the Owners, parent,   375
affiliated, related and subsidiary companies; the Owners, sub contractors,   376
the Vessel, its Master Officers and Crew its registered owner, its operator, its   377
demise charterer(s) their respective employees and their respective   378
underwriters.   379
(iii) The Owners or the Charterers shall be deemed to be acting as agent or   380
trustee of and for the benefit of all such persons and parties set forth above,   381
but only for the limited purposes of contracting for the extension of such   382
benefits to such persons and parties.   383
(f) Mutual Waiver of Recourse (Optional, only applicable if stated in Box 26. but   384
regardless of whether this option is exercised the other provisions of Clause 12   385
shall apply and shall be paramount)   386
In order to avoid disputes regarding liability for personal injury or death of   387
employees or for loss of or damage to property the Owners and the   388
Charterers have entered into, or by this Charter Party agree to enter into an   389
Agreement for Mutual Indemnity and Waiver of Recourse (in a form   390
substantially similar to that specified in ANNEX "C") between the Owners, the   391
Charterers and the various contractors and sub-contractors of the Charterers   392
(g) Hazardous and Noxious Substances.- Notwithstanding any other   393
provision of this Charter Party to the contrary, the Charterers shall always be   394
responsible for any losses, damages or liabilities suffered by the Owners,   395
their employees, contractors or sub-contractors, by the Charterers, or by   396
third parties, with respect to the Vessel or other property,personal injury or   397
death, pollution or otherwise, which losses, damages or liabilities are caused   398
directly or indirectly, as a result of the Vessels carriage of any hazardous and   399
noxious substances in whatever form or ordered by the Charterers, and the   400
Charterers shall defend, indemnify the Owners and hold the Owners harmless   401
for any expense, loss or liability whatsoever or howsoever arising with   402
respect to the carriage of hazardous or noxious substances.   403
   404
   405
   406
   407
   408
   409
   410

SABA ENGINEERING SERVICES SDN BHD
Company No. 13911-D

### 13. Pollution

(b) Except as otherwise provided for in Clause 13(c)(ii), the Owners shall be liable for, and agree to indemnify, defend and hold harmless the Charterers against, all claims, costs, expenses, actions, proceedings, suits, demands and liabilities whatsoever arising out of actual or potential pollution damage and the cost of cleanup or control thereof arising from acts or omissions of the Owners or their personnel which cause or allow discharge, spills or leaks from: the Vessel, except that such emanate from cargo thereon or therein. (411-417)

(b) The Charterers shall be liable for and agree to indemnify, defend and hold harmless the Owners from all claims, costs, expenses, actions, proceedings, suits, demands, liabilities, loss or damage whatsoever arising out of or resulting from any other actual or potential pollution damage, even where caused wholly or partially by the act, neglect or default of the Owners, their employees, contractors or sub-contractors or by the unseaworthiness of the Vessel. (418-426)

### 14. Insurance

(a)(i) The Owners shall procure and maintain in effect for the duration of this Charter Party, with reputable insurers, the insurances set forth in ANNEX "B". Policy limits shall be not less than those indicated. Reasonable deductibles are acceptable and shall be for the account of the Owners. (427-430)

(ii) The Charterers shall upon request be named as co-insured. The Owners shall upon request cause insurers to waive subrogation rights against the Charterers (as encompassed in Clause 12(e)(i)). Co-insurance and/or waivers of subrogation shall be given only insofar as these relate to liabilities which are properly the responsibility of the Owners under the terms of this Charter Party. (431-436)

(b) The Owners shall upon request furnish the Charterers with certificates of insurance which provide sufficient information to verify that the Owners have complied with the insurance requirements of this Charter Party. (437-439)

(c) If the Owners fail to comply with the aforesaid insurance requirements, the Charterers may without prejudice to any other rights or remedies under this Charter Party, purchase similar coverage and deduct the cost thereof from any payment due to the Owners under this Charter Party. (440-443)

### 15. Saving of Life and Salvage

(a) The Vessel shall be permitted to deviate for the purpose of saving life or sea without prior approval of or notice to the Charterers and without loss of Hire provided however that notice of such deviation is given as soon as possible. (444-448)

(b) Subject to the Charterers' consent, which shall not be unreasonably withheld, the Vessel shall be at liberty to undertake attempts at salvage, it being understood that the Vessel shall be off Hire from the time she leaves port or commences to deviate and she shall remain off Hire until she is again in every way ready to resume the Charterers' service at a position which is not less favourable to the Charterers than the position at the time of leaving port or deviating for the salvage services. (449-456)

(c) All salvage monies earned by the Vessel shall be divided equally between the Owners and the Charterers, after deducting the Master's, Officers' and Crew's share, legal expenses, value of fuel and lubricants consumed, Hire of the Vessel lost by the Owners during the salvage, repairs to damage sustained, if any, and any other extraordinary loss or expense sustained as a result of the salvage. (457-462)

(d) The Charterers shall be bound by all measures taken by the Owners in order to secure payment of salvage and to fix its amount. (463-464)

(e) The Owners shall waive their right to claim any award for salvage performed on property owned by or contracted to the Charterers, always provided such property was the object of the operation the Vessel was chartered for and the Vessel shall remain on hire when rendering salvage services to such property. This waiver is without prejudice to any right the Vessel's Master, Officers and Crew may have under any title. (465-470)

If the Owners render assistance to such property in distress on the basis of "no claim for salvage" then, notwithstanding any other provisions contained in this Charter Party and even in the event of neglect or default of the Owners, Master, Officers or Crew: (471-473)

(i) The Charterers shall be responsible for and shall indemnify the Owners against payments made, under any legal rights, to the Master, Officers and Crew in relation to such assistance. (474-476)

(ii) The Charterers shall be responsible for and shall reimburse the Owners for any loss or damage sustained by the Vessel or her equipment by reason of giving such assistance and shall also pay the Owners' additional expenses thereby incurred. (477-480)

(iii) The Charterers shall be responsible for any actual or potential spill, seepage and/or emission of any pollutant howsoever caused occurring within the offshore site and any pollution resulting therefrom, wheresoever it may occur and including but not limited to the cost of such measures as are reasonably necessary to prevent or mitigate pollution damage, and the Charterers shall indemnify the Owners against any liability cost or expense arising by reason of such actual or potential spill, seepage and/or emission. (481-488)

(iv) The Vessel shall not be off-hire as a consequence of giving such assistance, or effecting repairs under sub-paragraph (ii) of this sub clause, and time taken for such repairs shall not count against time granted under Clause 11(c). (489-492)

(v) The Charterers shall indemnify the Owners against any liability cost and/or expense whatsoever in respect of any loss of life, injury, damage or other loss to person or property howsoever arising from such assistance. (493-496)

### 16. Lien

The Owners shall have a lien upon all cargoes (except property owned by the Charterer's clients and subcontractors) for all claims against the Charterers under this Charter Party and the Charterers shall have a lien on the Vessel for all monies paid in advance and not earned. The Charterers will not suffer, nor permit to be continued, any lien or encumbrance incurred by them or their agents, which might have priority over the title and interest of the Owners in the Vessel Except as provided in Clause 12, the Charterers shall indemnify and hold the Owners harmless against any lien of whatsoever nature arising upon the Vessel during the Charter Period while she is under the control of the Charterers, and against any claims against the Owners arising out of the operation of the Vessel by the Charterers or out of any neglect of the Charterers in relation to the Vessel or the operation thereof. Should the Vessel be arrested by reason of claims or liens arising out of her operation hereunder unless brought about by the act or neglect of the Owners, the Charterers shall at their own expense take all reasonable steps the Vessel is released and at their own expense put up bail to secure release of the Vessel. (497-510)

### 17. Sublet and Assignment

(a) Charterers - The Charterers shall have the option of subletting, assigning or loaning the Vessel to any person or company not competing with the Owners, subject to the Owners' prior approval which shall not be unreasonably withheld, upon giving notice in writing to the Owners, but the original Charterers shall always remain responsible to the Owners for due performance of the Charter Party and contractors of the person or company taking such subletting, assigning or loan shall be deemed contractors of the Charterers for all the purposes of this Charter Party. The Owners make it a condition of such consent that additional Hire shall be paid as agreed between the Charterers and the Owners having regard to the nature and period of any intended service of the Vessel. (511-520)

(b) If the Vessel is sublet, assigned or loaned to undertake rig anchor handling and/or towing operations connected with equipment, other than that used by the Charterers, a daily increment to the Hire in the amount as stated in Box 29 or pro rata shall be paid for the period between departure for such operations and return to her normal duties for the Charterers. (521-525)

(c) Owners - The Owners may not assign or transfer any part of this Charter Party without the written approval of the Charterers, which approval shall not be unreasonably withheld. (526-529)

(d) Approval by the Charterers of such subletting or assignment shall not relieve the Owners of their responsibility for due performance of the part of the services which is sublet or assigned. (530-532)

### 18. Substitute Vessel

The Owners shall be entitled at any time, whether before delivery or at any other time during the Charter Period, to provide a substitute vessel, subject to the Charterers, prior approval which shall not be unreasonably withheld. (533-537)

### 19. War

(a) Unless the consent of the Owners be first obtained, the Vessel shall not be ordered nor continue to any port or place or on any voyage nor be used on any service which will bring the Vessel within a zone which is dangerous as a result of any actual or threatened act of war, war, hostilities, warlike operations, acts of piracy or of hostility or malicious damage against this or any other vessel or its cargo by any person, body or state whatsoever, revolution, civil war civil commotion or the operation of international law, nor be exposed in any way to any risks or penalties whatsoever consequent upon the imposition of sanctions, nor carry any goods that may in any way expose her to any risks of seizure, capture, penalties or any other interference of any kind whatsoever by the belligerent or fighting powers or parties or by any government or rulers. (538-549)

(b) Should the Vessel approach or be brought or ordered within such zone, or be exposed in any way to the said risks, (i) the Owners shall be entitled from time to time to insure their interest in the Vessel for such items as they deem fit up to its open market value and also in the Hire against any of the risks likely to be involved thereby, and the Charterers shall make a refund on demand of any additional premium thereby incurred, and (ii) notwithstanding the terms of Clause 11 Hire shall be payable for all time lost including any loss owing to loss of or injury to the Master, Officers, Crew or passengers or to refusal by any of them to proceed to such zone or to be exposed to such risks (c) In the event of additional insurance premiums being incurred or of the wages of the Master and/or Officers and/or Crew and/or the cost of provisions and or stores for deck and/or engine room being increased by reason of or during the existence of any of the matters mentioned in sub-clause (a) the amount of any additional premium and/or increase shall be added to the Hire, and paid by the Charterers on production of the Owners, account therefor, such account being rendered monthly. (550-565)

(d) The Vessel shall have liberty to comply with any orders or directions as to departure, arrival, routes, ports of call, stoppages, destination, delivery or in any other way whatsoever given by the government of the nation under whose flag the Vessel sails or any other government or any person (or body) acting or purporting to act with the authority of such government or by any committee or person having under the terms of the war risks insurance on the Vessel the right to give any such orders or directions. (566-572)

(e) In the event of the outbreak of war (whether there be a declaration of war or not) between any of the countries stated in Box 30 or in the event of the nation under whose flag the Vessel sails becoming involved in war (whether there be a declaration of war or not) both the Owners and the Charterers may terminate this Charter Party, whereupon the Charterers shall redeliver the Vessel to the Owners in accordance with PART I if it has cargo on board after discharge thereof at destination or, if debarred under this Clause from reaching or entering it, at a near open and safe port or place as directed by the Owners, or if she has cargo on board, at the port or place at which it then is or if at sea at a near, open and safe port or place as directed by the Owners. In all cases Hire shall continue to be paid and, except as aforesaid, all other provisions of this Charter Party shall apply until redelivery. (573-584)

(f) If in compliance with the provisions of this Clause anything is done or is not done, such shall not be deemed a deviation. (585-586)

(g) The Charterers shall procure that all Bills of Lading issued under this Charter Party shall contain the stipulations contained in sub-clauses (a), (d) and (f) of this Clause. (587-590)

### 20. Excluded Ports

(a) The Vessel shall not be ordered to nor bound to enter without the Owners, written permission (a) any place where fever or epidemics are prevalent or to which the Master, Officers and Crew by law are not bound to follow the Vessel; (b) any ice-bound place or any place where ignis, lightnings, marks and buoys are or are likely to be withdrawn by reason of ice or the Vessel's arrival or where there is risk that ordinarily the Vessel will not be able on account of ice to reach the place or to get out after having completed her operations. The Vessel shall not be obliged to force ice nor to follow an icebreaker. If, on account of ice, the Master considers it dangerous to remain at the loading or discharging place for fear of the Vessel being frozen in and/or damaged, he has liberty to sail to a convenient open place and await the Charterers, fresh instructions. (591-604)

(b) Should the Vessel approach or be brought or ordered within such place, or be exposed in any way to the said risks, the Owners shall be entitled from time to time to insure their interests in the Vessel and/or Hire against any of the risks likely to be involved thereby on such terms as they shall think fit, the Charterers to make a refund to the Owners of the premium on demand. (605-611)

Company No. 13911-D

**"SUPPLYTIME 89" Uniform Time Charter Party for Offshore Service Vessels**          **PART II**

Notwithstanding the terms of Clause 11 Hire shall be paid for all time lost including any lost owing to loss of or sickness or injury to the Master, Officers, Crew or passengers or to the action of the Crew in refusing to proceed to such place or to be exposed to such risks.

**21. General Average and New Jason Clause**

General Average shall be adjusted and settled in London unless otherwise stated in Box 31, according to York/Antwerp Rules, 1974, as may be amended. Hire shall not contribute to General Average. Should adjustment be made in accordance with the law and practice of the United States of America, the following provision shall apply:
"In the event of accident, danger, damage or disaster before or after the commencement of the voyage, resulting from any cause whatsoever, whether due to negligence or not, for which, or for the consequence of which, the Owners are not responsible, by statute, contract or otherwise, the cargo, shippers, consignees or owners of the cargo shall contribute with the Owners in General Average to the payment of any sacrifices, loss or expenses of a General Average nature that may be made or incurred and shall pay salvage and special charges incurred in respect of the cargo.
If a salving vessel is owned or operated by the Owners, salvage shall be paid for as fully as if the said salving vessel or vessels belonged to strangers. Such deposit as the Owners, or their agents, may deem sufficient to cover the estimated contribution of the cargo and any salvage and special charges thereon shall, if required, be made by the cargo, shippers, consignees or owners of the cargo to the Owners before delivery".

**22. Both-to-Blame Collision Clause**

If the Vessel comes into collision with another ship as a result of the negligence of the other ship and any act, neglect or default of the Master, mariner, pilot or the servants of the Owners in the navigation or the management of the Vessel, the Charterers will indemnify the Owners against all loss or liability to the other or non-carrying ship or her owners insofar as such loss or liability represent loss of or damage to, or any claim whatsoever of the owners of any goods carried under this Charter Party paid or payable by the other or non-carrying ship or her owners to the owners of the said goods and set off recouped or recovered by the other or non-carrying ship or her owners as part of their claim against the Vessel or the Owners. The foregoing provisions shall also apply where the owners, operators or those in charge of any ship or ships or objects other than or in addition to the colliding ships or objects are at fault in respect of a collision or contact.

**23. Structural Alterations and Additional Equipment**

The Charterers shall have the option of making structural alterations to the Vessel or installing additional equipment with the written consent of the Owners which shall not be unreasonably withheld but unless otherwise agreed the Vessel is to be redelivered reinstated, at the Charterers, expense, to her original condition. The Vessel is to remain on hire during any period of these alterations or reinstatement. The Charterers, unless otherwise agreed, shall be responsible for repair and maintenance of any such alteration or additional equipment.

**24. Health and Safety**

The Owners shall comply with and adhere to all applicable international, national and local regulations pertaining to health and safety, and such Charterers, instructions as may be appended hereto.

**25. Taxes**

Each party shall pay taxes due on its own profit, income and personnel. The Charterers shall pay all other taxes and dues arising out of the operation or use of the Vessel during the Charter Period.
In the event of change in the Area of Operation or change in local regulation and/or interpretation thereof, resulting in an unavoidable and documented change of the Owners, tax liability after the date of entering into the Charter Party or the date of commencement of employment, whichever is the earlier Hire shall be adjusted accordingly.

**26. Early Termination**

**(a) For Charterers' Convenience.** - The Charterers may terminate this Charter Party at any time by giving the Owners written notice as stated in Box 15 and by paying the balance as stated in Box 14 and the demobilisation charge stated in Box 16, as well as Hire or other payments due under the Charter Party.

**(b) For Cause.** - If either party becomes informed of the occurrence of any event described in this Clause that party shall so notify the other party promptly in writing and in any case within 3 days after such information is received. If the occurrence has not ceased within 3 days after such notification has been given, this Charter Party may be terminated by either party without prejudice to any other rights which either party may have, under any of the following circumstances:

(i) **Requisition.** - If the government of the state of registry and/or the flag of the Vessel, or any agency thereof requisitions for hire or title or otherwise takes possession of the Vessel during the Charter Period.

(ii) **Confiscation.** - If any government, individual or group, whether or not purporting to act as a government or on behalf of any government, confiscates, requisitions, expropriates, seizes or otherwise takes possession of the Vessel during the Charter Period.

(iii) **Bankruptcy.** - In the event of an order being made or resolution passed for the winding up, dissolution, liquidation or bankruptcy of either party (otherwise than for the purpose of reconstruction or amalgamation) or if a receiver is appointed or if it suspends payment or ceases to carry on business.

(iv) **Loss of Vessel.** - If the Vessel is lost, actually or constructively or missing, unless the Owners provide a substitute vessel pursuant to Clause 18. In the case of termination, Hire shall cease from the date the Vessel was lost or in the event of a constructive total loss, from the date of the event giving rise to such loss. If the date of loss cannot be ascertained or the Vessel is missing, payment of Hire shall cease from the date the Vessel was last reported.

(v) **Breakdown.** - If, at any time during the term of this Charter Party, a breakdown of the Owners, equipment or Vessel results in the Owners' being unable to perform their obligations hereunder for a period exceeding that stated in Box 32, unless the Owners provide a substitute vessel pursuant to Clause 18.

(vi) **Force Majeure.** - If a force majeure condition as defined in Clause 27 prevails for a period exceeding 15 consecutive days.

(vii) **Default.** - If either party is in repudiatory breach of its obligations thereunder.

Termination as a result of any of the above mentioned causes shall not relieve the Charterers of any obligation for Hire and any other payments due.

**27. Force Majeure.**

Neither the Owners nor the Charterers shall be liable for any loss, damage or delay or failure in performance hereunder resulting from any force majeure event, including but not limited to acts of God, fire, action of the elements, epidemics, war (declared or undeclared), warlike actions, insurrection, revolution or civil strife, piracy, civil war or hostile action, strikes or differences with workmen (except for disputes relating solely to the Owners, or the Charterers, employees), acts of the public enemy, federal or state laws, rules and regulations of any governmental authorities having or asserting jurisdiction in the premises or of any other group, organisation or informal association (whether or not formally recognised as a government), and any other cause beyond the reasonable control of either party which makes continuance of operations impossible.

**28. Notices and Invoices**

Notices and invoices shall be given under this Charter Party shall be given in writing to the addresses stated in Boxes 21, 35 and 36 as appropriate.

**29. Wreck Removal**

If the Vessel sinks and becomes a wreck and an obstruction to navigation and has to be removed upon request by any compulsory law or authority having jurisdiction over the area where the wreck is placed, the Owners shall be liable for any and all expenses in connection with the raising, removal, destruction, lighting or marking of the wreck.

**30. Confidentiality**

All information or data obtained by the Owners in the performance of this Charter Party is the property of the Charterers, is confidential and shall not be disclosed without the prior written consent of the Charterers. The Owners shall use their best efforts to ensure that the Owners, any of their sub-contractors, and employees and agents thereof shall not disclose any such information or data.

**31. Law and Arbitration**

*(a) This Charter Party shall be governed by English law and any dispute arising out of this Charter Party shall be referred to arbitration in London, one arbitrator being appointed by each party, in accordance with the Arbitration Acts 1950 and 1979 or any statutory modification or re-enactment thereof for the time being in force. On the receipt by one party of the nomination in writing of the other party's arbitrator that party shall appoint their arbitrator within 14 days, failing which the arbitrator already appointed shall act as sole arbitrator. If two arbitrators properly appointed shall not agree they shall appoint an umpire whose decision shall be final.

*(b) Should any dispute arise out of this Charter Party, the matter in dispute shall be referred to three persons at New York, one to be appointed by each of the parties hereto, and the third by the two so chosen; their decision or that of any two of them shall be final, and for the purpose of enforcing any award, this agreement may be made a rule of the Court. The arbitrators shall be members of the Society of Maritime Arbitrators, Inc. of New York, and the proceedings shall be conducted in accordance with the rules of the Society.

*(c) Any dispute arising out of this Charter Party shall be referred to arbitration at the place stated in Box 33 subject to the law and procedures applicable there.

(d) If Box 33 in PART I is not filled in, sub-clause (a) of this Clause shall apply.

* (a), (b) and (c) are alternatives; state alternative agreed in Box 33.

**32. Entire Agreement**

This is the entire agreement of the parties, which supersedes all previous written or oral understandings and which may not be modified except by a written amendment signed by both parties.

**33. Severability Clause**

If any portion of this Charter Party is held to be invalid or unenforceable for any reason by a court or governmental authority of competent jurisdiction, then such portion will be deemed to be stricken and the remainder of this Charter Party shall continue in full force and effect.

**34. Demise**

Nothing herein contained shall be construed as creating a demise of the Vessel to the Charterers.

**35. Definitions**

"Well" is defined for the purposes of this Charter Party as the time required to drill, test, complete and/or abandon a single borehole including any side-track thereof.
"Offshore unit" is defined for the purposes of this Charter Party as any vessel, offshore installation, structure and/or mobile unit used in offshore exploration, construction, pipelaying or repair, exploitation or production
"Offshore site" is defined for the purposes of this Charter Party as the area within three nautical miles of an "offshore unit" from or to which the Owners are requested to take their Vessel by the Charterers.
"Employees" is defined for the purposes of this Charter Party as employees, directors, officers, servants, agents or invitees.

**36. Headings**

The headings of this Charter Party are for identification only and shall not be deemed to be part hereof or be taken into consideration in the interpretation or construction of this Charter Party.

Additional Clauses:

37. Charterers will pay owners USD 100,000/- upon onhire of barge which shall be adjusted towards the payment of last invoice of Charter hire to the Owners.

38. Owners will give 24 hrs notice to the Charterers of Barge Readiness upon expiry of which it will be considered as Barge onhire.

39. Victualling for the crew onboard will be provided by the charterers at no cost to the Owners.

40. In the event there is a failure to attain any clearances, permits etc whatsoever that prevent the lawful deployment of the barge Morayo to the offshore project, the Charterers have the right to cancel this Agreement without obligation of hire or payment and without obligation under Part 1 Box 14

41. Notwithstanding Clause 8 the Charter shall not bear any costs or liabilities whatsoever in establishing the lawful status of the vessel in Mumbai prior to mobilization to ONGC fields , including but not limited to hire of tugs , AHTs , utilized days etc . For clarity, the Charterers obligation exists only when the vessel has all clearances, is in port and is able to travel to the ONGC field immediately.

42. Charterers to give Bank Guarantee of a sum of 15 days of Charter Hire to the Owners upon signing of Charter Party Agreement as an assurance to the Owners for the payments.



Additional Clauses:

37. Charterers will pay owners USD 100,000/- upon onhire of barge which shall be adjusted towards the payment of last invoice of Charter hire to the Owners.

38. Owners will give 24 hrs notice to the Charterers of Barge Readiness upon expiry of which it will be considered as Barge onhire.

39. Victualling for the crew onboard will be provided by the charterers at no cost to the Owners.

40. In the event there is a failure to attain any clearances, permits etc whatsoever that prevent the lawful deployment of the barge Morayo to the offshore project, the Charterers have the right to cancel this Agreement without obligation of hire or payment and without obligation under Part 1 Box 14

41. Notwithstanding Clause 8 the Charter shall not bear any costs or liabilities whatsoever in establishing the lawful status of the vessel in Mumbai prior to mobilization to ONGC fields , including but not limited to hire of tugs , AHTs , utilized days etc . For clarity, the Charterers obligation exists only when the vessel has all clearances, is in port and is able to travel to the ONGC field immediately.

42. Charterers to give Bank Guarantee of a sum of 15 days of Charter Hire to the Owners upon signing of Charter Party Agreement as an assurance to the Owners for the payments.



# EXHIBIT 2

## JAPAUL OIL & MARITIME SERVICES PLC

| S.No | Invoice raised By Japaul Invoice No. | Period | No of days | Rate | Amount | Remarks | Due date of payment as per CP | Interest accumulated As on 30/09/09 | Days Over Due | Interest payable at 8% annum |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | J/SES/002 - 22.02.09 | 22.02.09 TO 08.03.09 | 15 Days | $ 27,000.00 | $ 405,000.00 | Paid PV /IND 02576 /19.03.09 | 20/07/2009 | | 94 | $ 8,344.11 |
| 2 | J/SES/003 - 08.04.09 | 09.03.09 to 23.03.09 | 15 Days | $ 27,000.00 | $ 405,000.00 | Paid PV IND 02648 /08.06.09 | 30/09/2009 | | 166 | $ 5,739.84 |
| 3 | J/SES/004 - 20.03.09 | 24.03.09 to 07.04.09 | <= Included ence | $ 27,000.00 | $ 405,000.00 | Paid PV IND 02674 /29.04.09 | 17/04/2009 | | | |
| 4 | J/SES/005 - 02.04.09 | 08.04.09 to 22.04.09 | 15 Days | $ 27,000.00 | $ 405,000.00 | considered paid offset with BG date | 17/04/2009 | | | |
| 5 | J/SES/005 - ROB Bunker -02/04/09 | Full period | 222.2 tons | $ 710.00 | $ 157,762.00 | Not paid | 17/04/2009 | | | |
| 6 | J/SES/006-09.04.09 | 23.04.09 to 07.05.09 | 15 Days | $ 27,000.00 | $ 405,000.00 | Not paid | 24/04/2009 | 30/09/2009 | 159 | $ 14,113.97 |
| 7 | J/SES/007-04.05.09 | 08.05.09 to 22.05.09 | 15 Days | $ 27,000.00 | $ 405,000.00 | Not paid | 19/05/2009 | 30/09/2009 | 134 | $ 11,894.79 |
| 8 | J/SES/008-22.05.09 | 23.05.09 to 31.05.09 | 9 Days | $ 27,000.00 | $ 243,000.00 | Not paid | 06/06/2009 | 30/09/2009 | 116 | $ 6,178.19 |
| 9 | J/SES/OD/001-31.05.09 | 21.05.09 to 31.05.09 | 11 Days | $ 3,000.00 | $ 33,000.00 | Not paid | 15/06/2009 | 30/09/2009 | 107 | $ 773.92 |
| 10 | J/SES/009-15.06.09 | 01.06.09 to 15.06.09 | 15 Days | $ 27,000.00 | $ 405,000.00 | Not paid | 30/06/2009 | 30/09/2009 | 92 | $ 8,166.58 |
| 11 | J/SES/OD/002-15.06.09 | 01.06.09 to 15.06.09 | 15 Days | $ 3,000.00 | $ 45,000.00 | Not paid | 30/06/2009 | 30/09/2009 | 92 | $ 907.40 |
| 12 | J/SES/010-30.06.09 | 16.06.09 to 30.06.09 | 15 Days | $ 27,000.00 | $ 405,000.00 | Not paid (but to take only upto 26/6) | 15/07/2009 | 30/09/2009 | 77 | $ 5,012.38 |
| 13 | J/SES/OD/003-25.06.09 | 16.06.09 to 30.06.09 | 15 Days | $ 3,000.00 | $ 45,000.00 | Not paid (but to take only upto 26/6) | 10/07/2009 | 30/09/2009 | 82 | $ 593.10 |
| | | | | Total | $ 3,763,762.00 | | | | | $ 61,724.38 |

### PAYMENTS RECEIVED from SARKU

| PV No. / Date | Bank Name | Remitted on | Amount | Remarks |
|---|---|---|---|---|
| PV 4003 -10.03.09 | CIMB | 10.03.09 | $ 100,000.00 | Advance payment yet to recover |
| IND 02576 /19.03.09 | CIMB | 25.03.09 | $ 405,000.00 | |
| IND 02648 /08.04.09 | CIMB | 13.04.09 | $ 304,916.00 | |
| IND 02674 /29.04.09 | Maybank | 08.05.09 | $ 396,234.00 | |
| Encashment of BG | CIMB | 20.07.09 | $ 405,000.00 | |
| | | Total | $ 405,000.00 | |

NET BALANCE PAYABLE    $ 1,611,140.00    [Invoice Amount + 4days(183,762,762+$27,000 x4)+$3000xd)+Interest($61,724.38)+Paid amount(1,611,140)]

Confidential

## CS Offshore Vs Sarku Engineering

| | | | |
|---|---|---|---|
| Charter hire as per CP for FIRM period | | | |
| Charter Hire of Barge Morayo for firm period of 3 months | $ | 2,430,000.00 | |
| (22-Feb to 22-May) | | | |
| Bunker Invoice $710 for 222.20 | $ | 157,762.00 | |
| Payments made by Sarku | $ | (1,611,140.00) | |
| **Balance Charter hire due for firm period** | **$** | **976,622.00** | <= Included encashment of bank guarantee |
| | | | |
| **Detention period of Customs** | up to 26/06/2009 | | |
| Charter hire of Morayo 22-May to 26-june (date of court | $ | 945,000.00 | <= Barge released by customs officially by court on 26/June/2009 |
| ruling) | | | |
| Hire for Placing a standby tug for the non-propelled barge | | | |
| 21-May to 26-June | $ | 111,000.00 | |
| **Total** | **$** | **1056,000.00** | |
| Interest during the Firm period & Detention period | **$** | **61,724.38** | ( Interest adjusted with date of Bank guarantee encashment) |
| **TOTA OF THE ABOVE** | **$2,094,346.38** | | |

| | | | |
|---|---|---|---|
| **ALL OTHER EXPENSES** | | | |
| **Port Dues (estimate)** | | | |
| Berth hire 22Feb till 28th Feb: on hire period | $ | 3,888.36 | (7days x 24hrs x 0.0075 x GRT 3086); Berth Hire   to back charge– agent charged us by mistake |
| Berth hire14th May to 22 May: Firm period | $ | 295.00 | (8days x 24 x GRT 3086 x $0.000442 per hr) ; Anchorage charges |
| Berth hire 23rd May till 28th May: Detention period | $ | 1,146.00 | (35days x 24 x GRT 3086 x $0.000442 per hr) ; Anchorage charges |
| Other Port dues estimated | $ | 1,177.64 | |
| **Total** | **$** | **6,507.00** | |
| | | | |
| **Bunker** | | | |
| Firm period Barge Morayo: 14th May to 22 May | $ | 8,307.00 | (1.31 x 8days x $710) |
| Detention period: Barge Morayo : 23 may till 26th June | $ | 32,305.00 | (1.31 x 35days x $710) |
| Detention :Stby Tug: ODUN : 21 May till 26.June09 | $ | 7,881.00 | (0.31 x 37days x $710) |
| **Total** | **$** | **48,493.00** | |
| | | | |
| **Other Expenses (about)** | | | |
| Includes Consultant, Legal charges and fees, Our | **$** | **445,000.00** | |
| Attendance & travel charges, communication and other | | | |
| miscellaneous fees and charges till 26 June 2009 | | | |
| **ALL OTHER EXPENSES (ABOUT)** | **$500,000.00** | | |

# EXHIBIT 3



>> Sarku Home

>> Products & Services

>> Experiences

>> ISO 9001 : 2000

>> SIB Online

>> Sarku WebMail

>> Current Events

>> Career With Us

>> Contact Us



- YOUR INTEGRATED OIL & GAS AND PETROCHEMICAL SOLUTION -



Best view in IE 4.0 above Resolution 1024 X 768

SARKU Engineering Services Sdn Bhd was set up in 1973, beginning with sub-sea services and inspection. We progressed to providing offshore topside maintenance, hookup, commissioning services before growing to include fabrication and construction in our service portfolio.

When we began, we were one of Malaysia's first companies in this line of work to be fully owned by locals, and among the first to have our own engineering-work barges and workboats fitted to the highest standards in the industry.

Since our inception in 1973, we have built a consistent track-record for innovation, integrity and initiative. We constantly strive for ever-increasing standards of excellence and innovation. Today, we'd like to have our pioneering spirit working for you.

Headquartered in the federal capital of **Kuala Lumpur**, Malaysia. **SARKU Engineering Services** has offices in **Miri**, **Kuantan**, **Labuan**, **Bintulu** and **Jakarta** with associate contacts in various parts of Asia.

As member of the **SAPURACREST PETROLEUM** group of companies, we are heavily involved in the oil, gas and petrochemical industry, with over 500 full-time personnel who provide the widest possible range of experience, skills and training in our integrated services all over Asia. With our own construction equipment and our own engineering work barges, the **SARKU SAMUDERA**, **SARKU 2000** and **SARKU UTAMA**, and work boats **SARKU SEMANTAN**, **SARKU SIPADAN**, **SARKU CLEMENTINE**, **SARKU SANTUBONG** and Diving Support Vessel (DSV) **SARKU SAMBANG**, we ensure fast mobilization and minimum interruption in our work. (View Vessel Specifications)

**SARKU** provides engineering and construction services with the emphasis on the highest standard of safety, quality and timely delivery. We work closely with our clients to meet specific needs, and adapt to local conditions for maximum productivity, anywhere in Asia.

Working on our core commitment to innovation, integrity, and initiative, we have established a reputation for working to schedule and having an excellent safety record. The The needs of our customers take priority at all times, and total customer satisfaction is our objective.

Sarku Engineering Services Sdn Bhd                                    Page 2 of 2

To address the specific needs of our clients, **SARKU** also provides specialized services that include project management, project material procurement and workpacking. Our wide range of available resources allows us to tailor and customize our project teams based on the clients requirements.

**SARKU** has over 30 years of proven reliability and integrity, but our standards are best judged by the certificates and licenses we hold, as well as the testimonials from satisfied customers who include oil & gas operators, major fabricators and petrochemical companies. Our client portfolio includes many blue-chip names of world repute such as Shell, Esso, Caltex, Hyundai, Samsung, Nippon Steel and Saipem, as well as respected local companies like Petronas.

Last updated on Thursday, 13 August 2009 01:41 PM +0800
Copyright ©2002-2005 Sarku Engineering Services Sdn Bhd All rights reserved.

# EXHIBIT 4



**Maybank**

Cawangan /.Branch /分行: MIRI SSC

MAKLUMAN DEBIT / ADVICE OF DEBIT / 支出通知書
Tarikh / Date / 日暗 .    08/05/2009

Kepada:    No. Akaun :    711310088952
To /致:    A/C No. /戶口號區:

SARKU ENGINEERING SERVICES SDN BHD
TINGKAT 6,BANGUNAN SAPURA
NO 7,JALAN TASIK
THE MINES RESORT CITY
43300 SERI KEMBANGAN

Akaun anda telah di DEBITKAN seperti berikut:
Your account has been DEBITED with the following:

167:32 SARKU ENGINEERING SERVICES SDN BHD    08MAY09 706300 P    A517A
711310088952 USD    396,224.00    3.5395   0
FTT TO US

| BUTIR-BUTIR 詳情 PARTICULARS | BEING AMT DEBITED FOR FTT TO US FOR USD396,224.00 | JUMLAH / AMOUNT / 总計 |
|---|---|---|
| | | USD    396,224.00 |

Ringgit USD THREE HUNDRED AND NINETY SIX THOUSAND AND TWO
HUNDRED AND TWENTY FOUR ONLY

b/p **Maybank**

**MALAYAN BANKING BERHAD (3813-K)**

Tandatangan yg diberi kuasa / Authorised Signatory / 受镜權者署 (1)

---

**Maybank**

Cawangan /.Branch /分行: MIRI SSC

MAKLUMAN DEBIT / ADVICE OF DEBIT / 支出通知書
Tarikh / Date / 日期    08/05/2009

Kepada:    No. Akaun :    511122127285
To /致:    A/C No. /戶口號區:

SARKU ENGINEERING SERVICES SDN BHD
LEVEL 6,SAPURA@MINES
7,JALAN TASIK,THE MINES RESORT
CITY,43300 SERI KEMBANGAN.
SELANGOR DARUL EHSAN.

Akaun anda telah di DEBITKAN seperti berikut:
Your account has been DEBITED with the following:

162917 SARKU ENGINEERING SERVICES SDN BHD    08MAY09 006500 P    A517A
511122127285    RM60.75 0
0

| BUTIR-BUTIR 詳情 PARTICULARS | BEING AMT DEBITED FOR SERVICE AND CABLE CHARGE FOR FTT TO US FOR USD 396224.00 | JUMLAH / AMOUNT / 总計 |
|---|---|---|
| | | RM60.75 |

Ringgit SIXTY AND SEN SEVENTY THREE ONLY

b/p **Maybank**

**MALAYAN BANKING BERHAD (3813-K)**

Tandatangan yg diberi kuasa / Authorised Signatory / 受镜權者署 (1)



**CIMB** BANK

CIMB Bank Berhad (13491-P)

BORANG PERMOHONAN KIRIMAN WANG
REMITTANCE APPLICATION FORM

90116913
WISMA GENTIN
Cawangan / Branch :
Tarikh / Date : 13-08-00

| | | | | CETAKAN KOMPUTER (untuk debit akaun sahaja) / COMPUTER VALIDATION (for debit account only) | |
|---|---|---|---|---|---|
| **PERMOHONAN UNTUK**<br>**APPLICATION FOR** | ☐ Draf Bank*<br>Banker's Draft* | ☐ Cek Bank<br>Banker's Cheque | ☐ Cek Kembara<br>Traveller's Cheque | ☒ Pindahan Telegrafik<br>Telegraphic Transfer | |
| | ☐ Terbitan Saham Bumi MIDF/MIH melalui BC/BD<br>Bumi MIDF/MIH Share Issue BC/BD | | ☐ Kiriman Wang melalui Sistem Giro Antara Bank<br>Interbank Giro (IBG) | ☐ Lain-lain<br>Others ... | |

*Draf Bank tidak akan dipalang ikalau arahan lain tidak diberikan / Banker's Draft will be issued uncrossed unless instructions to the contrary are given

**1. BUTIR-BUTIR PENERIMA / BENEFICIARY'S PARTICULARS.**

| | | | 8. MATA WANG<br>CURRENCY | JUMLAH<br>AMOUNT |
|---|---|---|---|---|
| Nama<br>Name | JAPAUL OIL & MARITIME SERVICES PLC | | USD | 304,916.00 |
| No. K.P. / Passport<br>I.C. / Passport No. | ☐ Pemastautin<br>Resident ☐ Bukan Pemastautin<br>Non-Resident | | | |
| Alamat<br>Address | | Poskod<br>Postcode | 9. **UNTUK KEGUNAAN BANK SAHAJA**<br>**FOR BANK'S USE ONLY** | |
| | | Negara<br>Country | KADAR<br>RATE | MATA WANG TEMPATAN<br>LOCAL CURRENCY |
| No. Tel.<br>Tel. No. | Faks<br>Fax | E-mel<br>E-mail | | |

**2. BUTIR-BUTIR BANK PENERIMA / BENEFICIARY'S BANK PARTICULARS**

| | | | KOMISEN<br>COMMISSION | |
|---|---|---|---|---|
| Nama Bank<br>Bank's Name | PLEASE REFER AS PER | | DUTI SETEM<br>STAMP DUTY | |
| Alamat (jika ada)<br>Address<br>(if available) | LETTER ATTACHED | No. Akaun Penerima<br>Beneficiary's Account No. | CAJ PERKHIDMATAN<br>SERVICE CHARGE | |
| | | Poskod<br>Postcode | | |
| | | Negara<br>Country | | |
| Catatan atau Arahan (jika ada)<br>Remarks or Instruction (if any) | | | JUMLAH<br>TOTAL | |

**3. BUTIR-BUTIR PEMOHON / APPLICANT'S PARTICULARS.**

| | | | NO. KONTRAK<br>CONTRACT NO. | KADAR K-AS OLEH<br>SPECIAL RATE BY |
|---|---|---|---|---|
| Nama<br>Name | SARKU ENGINEERING SERVICES SDN BHD | | | |
| No. K.P. / Passport<br>I.C. / Passport No. | No. Sykt. 378/73 [13911-D] | Pekerjaan Perniagaan/Syarikat<br>Business/Company Rep. No. | | |
| Alamat Tempatan<br>Local Address | No. 7, Jalan Tasik, The Mines Resort<br>43300 Seri Kembangan, Selangor.<br>Tel: 03-86598800, Fax: 03-86598589 | No. Tel.<br>Tel. No. | KOD MATA WANG<br>CURRENCY CODE | KOD BANK<br>BANK CODE |
| | | Tel. Bimbit<br>H/P | | |
| ☐ Pemastautin<br>Resident | ☐ Bukan Pemastautin, sila nyatakan negara asal,<br>Non-Resident, please state country of origin | | KOD SWIFT<br>SWIFT CODE | |

**4. UNTUK PINDAHAN TELEGRAFIK SAHAJA / TELEGRAPHIC TRANSFER ONLY.**

| | | BOP | |
|---|---|---|---|
| Nama dan Alamat Bank Perantara<br>Name and Address of Intermediary's Bank | Semua caj Bank di luar Malaysia akan dibayar di atas akaun<br>All Bank's charges outside Malaysia are for account of | KOD TUJUAN<br>PURPOSE CODE | |
| | ☐ Penerima<br>Beneficiary ☐ Pengirim<br>Remitter ☐ Berkongsi<br>Shared | KOD ENTITI<br>CONSTITUTION CODE | |
| ☐ Sila pilihkan bagi pihak kami / Please select for us | (hanya dengan pengesahan pegawai / only with officer's approval) | KOD NEGARA PENERIMA<br>BENEFICIARY'S COUNTRY CODE | |

0003 13/04/2009 1620 C621   1141 JAPAUL OIL &   30.00 1420136404313 NH
CORU5001 0003.8370 USD***304,916.00                                    SWIFT F ?

CETAKAN KOMPUTER / COMPUTER VALIDATION

**5. CARA PEMBAYARAN / MODE OF PAYMENT.**

| KIRIMAN WANG DALAM NEGERI / LOCAL REMITTANCES: | KIRIMAN WANG KE LUAR NEGERI / FOREIGN REMITTANCES: |
|---|---|
| ☐ Wang Tunai / Cash | ☐ Wang Tunai / Cash |
| ☐ Cek Cawangan Ini / House Cheque No.<br>(Dibayar kepada / Payable to: CIMB Bank Berhad) | ☐ Cek Cawangan Ini / House Cheque No.<br>(Dibayar kepada / Payable to: CIMB Bank Berhad) |
| ☐ Debit Ke Akaun / Debit Account No.<br>(Hanya untuk Akaun Simpanan sahaja / Strictly for Savings Account only) | ☒ Debit Ke Akaun / Debit Account No. 14170023187058 |

**6. PERAKUAN DAN TANDATANGAN / DECLARATION AND SIGNATURE**

Saya/Kami mengaku bahawa saya/kami telah membaca dan memahami terma dan syarat yang tertulis di belakang borang ini dan bersetuju untuk mematuhi terma dan syarat tersebut dan sekarang pindaan terhadap terma dan syarat tersebut yang mana mungkin diperkenalkan oleh Bank selepas ini. I I/We hereby declare that I/we have read and understood the terms and conditions set forth on the reverse of this form and agree to comply with and be bound by the provisions of the said terms and conditions and any amendments to the same which the Bank may subsequently introduce. Saya/Kami bersetuju untuk manangung ganti rugi Bank terhadap sebarang dan/atau semua kerugian, kos, perbelanjaan, ganti rugi, tuntutan, pemolatan, tindakan undang-undang, saman yang mungkin timbul akibat daripada permohonan ini dan/atau pihak Bank mengeluarkan sebarang Oral Bank, Cek Bank, Cek Kembara, dan/atau sebarang instrumen lain atau dokumen menurut permohonan ini. I I/We agree to indemnify and keep indemnified the Bank against any and/or all loss, costs, expenses, damages, claims, demands, actions and/or proceedings, which may arise in consequence of this application and/or the Bank's issuance of any Banker's Draft, Banker's Cheque, Traveller's Cheques, and/or any other instrument or document pursuant to this application.

P.O. BOX 1319
98008 MIRI
(No. Sykt. 378/73 [13911-D])

MIRI, SARAWAK
Tandatangan Pemohon / Applicant's Signature

| **UNTUK KEGUNAAN BANK**<br>**FOR BANK'S USE** | |
|---|---|
| Tandatangan Disemak /<br>Signature Verified | Tandatangan Pegawai /<br>Officer's Signature |

**7. DEKLARASI AKTA KAWALAN PERTUKARAN WANG 1953 DAN AKTA BANK NEGARA MALAYSIA 1958, OLEH PEMOHON UNTUK PEMBAYARAN KE LUAR NEGERI / BUKAN PEMASTAUTIN (DALAM MATA WANG ASING) / EXCHANGE CONTROL ACT 1953 AND CENTRAL BANK OF MALAYSIA ACT 1958 DECLARATION BY APPLICANT FOR PAYMENT TO OVERSEAS / NON-RESIDENTS / RESIDENTS (IN FOREIGN CURRENCY)**

| Tujuan Pembayaran / Purpose of Payment:<br>(Sila nyatakan di belakang borang ini untuk panduan / see reverse of this form for guide) | No. Rujukan Kelulusan Kawalan Pertukaran Wang, jika perlu<br>Exchange Control Approval Ref. No., if applicable |
|---|---|
| ☐ Barangan, sila jelaskan / Goods, please specify — Charter hire vessel ☐ FOB ☐ CIF | ☐ Pemindahan, sila jelaskan / Transfer, please specify |
| ☐ Perkhidmatan dan Pendapatan Pelaburan, sila jelaskan / Services and Investment Income, please specify | ☐ Urusniaga Modal, sila jelaskan / Capital Transactions, please specify |
| Saya/Kami<br>I/We | atau, bertindak di bawah kuasa<br>or, acting under the authority of | (nama pemohon / applicant's name) |

(No. K.P. / I.C. No: .....................)

mengaku dan mengesahkan bahawa semua maklumat yang dinyatakan oleh saya/kami di sini adalah benar dan tepat dan memenuhi Akta Kawalan Pertukaran Wang 1953 dan Akta Bank Negara Malaysia 1958 dan saya/kami akan bertanggungjawab sepenuhnya sekiranya sebarang maklumat yang diberi tidak betul, palsu atau tidak sempurna di dalam borang ini / I declare and confirm that all the information provided by me/us is true and correct and in full compliance with Exchange Control Act 1953 and Central Bank of Malaysia Act 1958 and I/we shall be fully responsible for any incomplete or inaccurate information provided in this form. Sekiranya dan mengizinkan pihak Bank untuk mendebitkan sebarang maklumat yang berkaitan dengan urusan dan/atau akaun kami saya/kami kepada Bank Negara Malaysia menurut Akta Kawalan Pertukaran Wang 1953 dan Akta Bank Negara Malaysia 1958 atau mana-mana pihak yang diberikan oleh undang-undang dan saya/kami saya/kami bersetuju menurut ... I also authorize the Bank to disclose any information in accordance with Exchange Control Act 1953 and Central Bank of Malaysia Act 1958 or to other party of any information which with regard to my/our affairs and/or banking accounts authorized by law or for such purposes as the Bank may deem reasonable or necessary

P.O. BOX 1319
98008 MIRI
(No. Sykt. 378/73 [13911-D])

MIRI, SARAWAK
Tandatangan Pemohon / Applicant's Signature

| **UNTUK KEGUNAAN BANK** | |
|---|---|
| Permohonan pembukaan bagi untuk<br>Pengesah Pertukaran Wang Asing /<br>Verified or confirmed on behalf of the<br>Controller of Foreign Exchange | Tandatangan Pegawai /<br>Officer's Signature |

| Penerima Wang/Akaun didebitkan oleh /<br>Cash received/Account debited by /<br>Teler / Teller | Urusniaga diluluskan oleh /<br>Transaction approved by /<br>Pegawai 1 / Officer 1 | | Instrumen dikeluarkan atau dikeluarkan semula oleh /<br>Instrument signed/I approved & reissued by /<br>Pegawai 1 / Officer 1 | Pegawai 2 / Officer 2 | **SALINAN PELANGGAN**<br>**CUSTOMER'S COPY** |


**CIMB** BANK

CIMB Bank Berhad (13491-P)

BORANG PERMOHONAN KIRIMAN WANG
REMITTANCE APPLICATION FORM

90116920
WISMA GENTING
Cawangan / Branch
Tarikh / Date 23-05-2007

| PERMOHONAN UNTUK *APPLICATION FOR* | ☐ Draf Bank / *Banker's Draft* ☐ Terbitan Saham Bumi MIDF/MM melalui BC/BD *Bumi MIDF/MM Share Issue BC/BD* | ☐ Cek Bank / *Banker's Cheque* | ☐ Cek Kembara / *Traveller's Cheque* Kiriman Wang melalui Sistem Giro Antara Bank *Interbank Giro (IBG)* | ☒ Pindahan Telegrafik / *Telegraphic Transfer* ☐ Lain-lain / *Others* |
|---|---|---|---|---|

*Draf Bank tidak akan dipalang ekalau arahan lain tidak diberikan / Banker's Draft will be issued uncrossed unless instructions to the contrary are given*

**1. BUTIR-BUTIR PENERIMA / BENEFICIARY'S PARTICULARS**

| | **8. MATA WANG** **CURRENCY** | **JUMLAH** **AMOUNT** |
|---|---|---|
| Nama / *Name* JAPAUL OIL & MARITIME SERVICES PLC | USD | 405,000.00 |

No. K.P. / Pasport / *I.C. / Passport No*      ☐ Pemastautin / *Resident*    ☐ Bukan Pemastautin / *Non-Resident*

Alamat / *Address*

Poskod / *Postcode*

Negara / *Country*

No. Tel / *Tel. No.*    Faks / *Fax*    E-mel / *E-mail*

**9. UNTUK KEGUNAAN BANK SAHAJA** **FOR BANK'S USE ONLY**

| KADAR RATE | MATA WANG TEMPATAN / LOCAL CURRENCY |
|---|---|

**2. BUTIR-BUTIR BANK PENERIMA / BENEFICIARY'S BANK PARTICULARS**

| Nama Bank / *Bank's Name* PLEASE REFER AS PER | No. Akaun Penerima / *Beneficiary's Account No* |
|---|---|

Alamat (jika ada) / *Address (if available)*   ATTACHMENT

Poskod / *Postcode*

Negara / *Country*

Catatan atau Arahan (jika ada) / *Remarks or Instruction (if any)*

| KOMISEN / COMMISSION | |
|---|---|
| DUTI SETEM / DUTY STAMP | |
| CAJ PERKHIDMATAN / SERVICE CHARGE | |
| JUMLAH / TOTAL | |

**3. BUTIR-BUTIR PEMOHON / APPLICANT'S PARTICULARS**

Nama / *Name*

No. K.P. / Pasport / *I.C. / Passport No*

No. Pendaftaran Perniagaan/Syarikat / *Business/Company Reg. No.*

Alamat Tempatan / *Local Address*

Bandar / *City*    No Tel / *Tel No*

Poskod / *Postcode*    Tel Bimbit / *H/P*

| NO. KONTRAK / CONTRACT NO. | KADAR KHAS OLEH / SPECIAL RATE BY |
|---|---|
| KOD MATA WANG / CURRENCY CODE | KOD BANK / BANK CODE |
| KOD SWIFT 1 / SWIFT 1 CODE | |

☐ Pemastautin / *Resident*    ☐ Bukan Pemastautin, sila nyatakan negara asal / *Non-Resident, please state country of origin*

**4. UNTUK PINDAHAN TELEGRAFIK SAHAJA / TELEGRAPHIC TRANSFER ONLY**

Nama dan Alamat Bank Perantara / *Name and Address of Intermediary's Bank*

Semua caj Bank di luar Malaysia akan dibayar di atas akaun / *All Bank's charges outside Malaysia are for account of*

☐ Penerima / *Beneficiary*   ☐ Pengirim / *Remitter*   ☐ Berdua-dua / *Shared*

☐ Sila pilihkan bagi pihak kami / *Please select for us*    *(hanya dengan pengesahan pegawai / only with officer's approval)*

| BOP | |
|---|---|
| KOD TUJUAN / PURPOSE CODE | |
| KOD ENTITI / CONSTITUTION CODE | |
| KOD NEGARA PENERIMA / BENEFICIARY'S COUNTRY CODE | |

CETAKAN KOMPUTER / COMPUTER VALIDATION

**5. CARA PEMBAYARAN / MODE OF PAYMENT**

KIRIMAN WANG DALAM NEGERI / LOCAL REMITTANCES:
☐ Wang Tunai / *Cash*
☐ Cek Cawangan Ini / House Cheque No. (Dibayar kepada / *Payable to*: CIMB Bank Berhad)
☐ Debit No. Akaun / Debit Account No (Simpanan sahaja / *Strictly for Savings Account only*)

KIRIMAN WANG KE LUAR NEGERI / FOREIGN REMITTANCES:
☐ Wang Tunai / *Cash*
☐ Cek Cawangan Ini / House Cheque No. (Dibayar kepada / *Payable to*: CIMB Bank Berhad)
☒ Debit No. Akaun / Debit Account No.   141700-23137058

**6. AKUAN DAN TANDATANGAN / DECLARATION AND SIGNATURE**

[declaration text]

Tandatangan Pemohon / *Applicant's Signature*

| UNTUK KEGUNAAN BANK FOR BANK'S USE | |
|---|---|
| Tandatangan Disahkan / Signature Verified | Tandatangan Pegawai / Officer's Signature |

**7. DEKLARASI AKTA KAWALAN PERTUKARAN WANG 1953 DAN AKTA BANK NEGARA MALAYSIA 1958** OLEH PEMOHON UNTUK PEMBAYARAN KE LUAR NEGERI / BUKAN PEMASTAUTIN / PEMASTAUTIN (DALAM MATA WANG ASING)
*EXCHANGE CONTROL ACT 1953 AND CENTRAL BANK OF MALAYSIA ACT 1958 DECLARATION BY APPLICANT FOR PAYMENT TO OVERSEAS / NON-RESIDENTS / RESIDENTS (IN FOREIGN CURRENCY)*

Tujuan Pembayaran / *Purpose of Payment* (sila keterangan di belakang borang ini untuk panduan / *see reverse of this form for guide*)

No. Ruj. Pelulusan Kawalan Pertukaran Wang, jika perlu / *Exchange Control Approval Ref No., if applicable*

☐ Barangan, sila jelaskan / *Goods, please specify*   charter hire vessel   ☐ FOB   ☐ CIF

☐ Pemindahan, sila jelaskan / *Transfer, please specify*

☐ Perkhidmatan dan Pendapatan Pelaburan, sila jelaskan / *Services and Investment Income, please specify*

☐ Urusniaga Modal, sila jelaskan / *Capital Transactions, please specify*

SayaKami / *I/We* _____ atau, bertindak di bawah kuasa / *or, acting under the authority of* _____ dengan ini / *hereby*

(No. K.P. / I.C. No. _____) (nama pemohon / *applicant's name*)

[declaration text]

Tandatangan Pemohon / *Applicant's Signature*

| UNTUK KEGUNAAN BANK FOR BANK'S USE | |
|---|---|
| Pemastautin/Bukan Pemastautin / *Resident/Non-Resident* | Tandatangan Pegawai / Officer's Signature |

RMT(0904) R1

# CIMB BANK

CIMB Bank Berhad (13491-P)

**BORANG PERMOHONAN KIRIMAN WANG**
**REMITTANCE APPLICATION FORM**

90138259
Cawangan / Branch: WISMA GENTING
Tarikh / Date: 10-03-2009

90138259

CETAKAN KOMPUTER (untuk sahih sahaja) / COMPUTER VALIDATION (for bank account only)

**PERMOHONAN UNTUK / APPLICATION FOR**

| | | | |
|---|---|---|---|
| ☐ Draf Bank / Banker's Draft | ☐ Cek Bank / Banker's Cheque | ☐ Cek Kembara / Traveller's Cheque | ☒ Pindahan Telegrafik / Telegraphic Transfer |
| | | ☐ Kiriman Wang melalui Sistem Giro Antara Bank / Interbank Giro (IBG) | ☐ Lain-lain / Others |

*Draf Bank tidak akan dipalang ikalau arahan lain tidak diberikan / Banker's Draft will be issued uncrossed unless instructions to the contrary are given

**1. BUTIR-BUTIR PENERIMA / BENEFICIARY'S PARTICULARS**

| | **MATA WANG / CURRENCY** | **JUMLAH / AMOUNT** |
|---|---|---|
| Nama / Name: JAPOIL OIL AND MARITIME SERVICES PLC | USD | 100,000.00 |
| No. K.P / Pasport / I.C. / Passport No.: A041     ☐ Pemastautin / Resident   ☐ Bukan Pemastautin / Non-Resident | | |
| Alamat / Address: | Poskod / Postcode | **10. UNTUK KEGUNAAN BANK SAHAJA / FOR BANK'S USE ONLY** |
| | Negara / Country | KADAR / RATE   MATA WANG TEMPATAN / LOCAL CURRENCY |
| No. Tel. / Tel. No.    Faks / Fax    E-mel / E-mail | | 3.913     371,300.00 |

**2. BUTIR-BUTIR BANK PENERIMA / BENEFICIARY'S BANK PARTICULARS**

| | | KOMISEN / COMMISSION |
|---|---|---|
| Nama Bank / Bank's Name: STANDARD CHARTERED BANK | No Akaun Penerima / Beneficiary's Account No.: 0011 7062000 | |
| Alamat (jika ada) / Address (if available): LAGOS NIGERIA | Poskod / Postcode | DUTI SETEM / STAMP DUTY |
| | Negara / Country | CAJ PERKHIDMATAN / SERVICE CHARGE |
| Catatan atau Arahan (jika ada) / Remarks or Instruction (if any): USD ABA NO: 026002561 | | JUMLAH / TOTAL |

**3. BUTIR-BUTIR PEMOHON / APPLICANT'S PARTICULARS**

| | NO. KONTRAK / CONTRACT NO. | KADAR KHAS OLEH / SPECIAL RATE BY |
|---|---|---|
| Nama / Name: SARKU ENGINEERING SERVICES SDN BHD | | |
| No. K.P / Pasport / I.C. / Passport No.: No. Sykt: 378/73 [13911-D]   No Pendaftaran Perniagaan/Syarikat / Business/Company Reg. No. | | |
| Alamat Tempatan / Local Address: No. 7, Jalan Tasik, The Mines Resort City, 43300 Seri Kembangan, Selangor. Tel: 03-86598800, Fax: 03-86598589 | No. Tel. / Tel. No.   No. Tel. Bimbit / HP | KOD MATA WANG / CURRENCY CODE   KOD BANK / BANK CODE |
| | Poskod / Postcode | |
| ☐ Pemastautin / Resident   ☐ Bukan Pemastautin / Non-Resident, please state country of origin | | KOD SWIFT / SWIFT CODE |

**4. UNTUK PINDAHAN TELEGRAFIK SAHAJA / TELEGRAPHIC TRANSFER ONLY**

| | | BOP |
|---|---|---|
| Nama dan Alamat Bank Perantara / Name and Address of Intermediary Bank: | ☐ Semua caj Bank di luar Malaysia akan dibayar di atas akaun / All Bank's charges outside Malaysia are for account of | KOD TUJUAN / PURPOSE CODE |
| | ☐ Penerima / Beneficiary   ☐ Pengirim / Remitter   ☐ Berkongsi / Shared | KOD ENTITI / CONSTITUTION CODE |
| Sila pilihkan bagi pihak kami / Please select for us | (hanya dengan pengesahan pegawai atau officer's approval) | KOD NEGARA PENERIMA / BENEFICIARY'S COUNTRY CODE |

CETAKAN KOMPUTER / COMPUTER VALIDATION

90138259

**5. CARA PEMBAYARAN / MODE OF PAYMENT**

**KIRIMAN WANG DALAM NEGERI / LOCAL REMITTANCES:**
☐ Wang Tunai / Cash
☐ Cek Cawangan Ini / House Cheque No. (Dibayar kepada / Payable to: CIMB Bank Berhad)
☐ Debit No. Akaun / Debit Account No. (hanya untuk Akaun Simpanan sahaja / Strictly for Savings Account only)

**KIRIMAN WANG KE LUAR NEGERI / FOREIGN REMITTANCES:**
☐ Wang Tunai / Cash
☐ Cek Cawangan Ini / House Cheque No. (Dibayar kepada / Payable to: CIMB Bank Berhad)
☒ Debit No. Akaun / Debit Account No. 1417002318705 9

**6. PERAKUAN DAN TANDATANGAN / DECLARATION AND SIGNATURE**

SARKU ENGINEERING SERVICES

[signature]

Tandatangan Pemohon / Applicant's Signature

| **UNTUK KEGUNAAN BANK / FOR BANK'S USE** | |
|---|---|
| Tandatangan Disahkan / Signature Verified | Tandatangan Pegawai / Officer's Signature |

**7. PENGAKUAN DAN PENGESAHAN**

**EXCHANGE CONTROL ACT 1953 AND CENTRAL BANK OF MALAYSIA ACT 1958: DECLARATION BY PAYEE/PAYMENT TO OVERSEAS? NON-RESIDENTS / RESIDENTS FOR FOREIGN CURRENCY)**

Tujuan Pembayaran / Purpose of Payment: (lihat keterangan di belakang borang ini untuk panduan / see reverse of this form for guide)

☐ Barangan, sila jelaskan / Goods, please specify: charter hire vessel   ☐ FOB   ☐ CIF   ☐ Pemindahan, sila jelaskan / Transfer, please specify
☐ Perkhidmatan dan Pendapatan Pelaburan, sila jelaskan / Services and Investment Income, please specify   ☐ Urusniaga Modal, sila jelaskan / Capital Transactions, please specify

SARKU ENGINEERING SERVICES

No. Ruj. Pelulusan Kawalan Pertukaran Wang, jika perlu / Exchange Control Approval Ref. No., if applicable

[signature]

Tandatangan Pemohon / Applicant's Signature

| **UNTUK KEGUNAAN BANK / FOR BANK'S USE** | |
|---|---|

MIRI, SARAWAK

| Perakuan Urusniaga diluluskan oleh / Transaction approved by | Pegawai 1 / Officer 1 | Pegawai 2 / Officer 2 | Instrumen distandardkan/TT disahkan & diremitkan oleh / Instrument standardised/TT approved & remitted by | Pegawai 1 / Officer 1 | Pegawai 2 / Officer 2 | **SALINAN PELANGGAN / CUSTOMER'S COPY** |
|---|---|---|---|---|---|---|
| Perakaunan Urusniaga didebitkan oleh / Account debited by | | | | | | |

No:550
9  11 08MAY09 637001 *   4517A
Ref Number : MIRTO805310919   Currency Code : USD   Revl. Rate :   3.5595
Foreign Amt :       396,224.00   RM Amt :   RM1,410,359.33
By Order Of : SARKU ENGINEERING SERVICES SDN BHD
Add       : P O BOX 1319
            98008 MIRI SARAWAK
            REMITTER MALAYSIAN
ID No:13911D        Country:US UNITED STATES
Pay To Benf: 2        BOP : 000363873
Benf Acct : /00 11 706 2 000
Name :JAPAUL OIL AND MARITIME SERVICES   Add:PLC

Bkr :STANDARD CHARTERED BANK        Add:1 MADISON AVENUE NEW YORK
Cty :UNITED STATE            Ctr:UNITED STATE
Remitter Stat: Resident      Benf Stat: Non-Resident Same/Diff Party:
Relationship :   Foreign Worker:   Purpose Code: 07000
Purpose Cd Desc: CHARTER OF VESSEL

## P e r m o h o n a n   U n t u k   K i r i m a n   W a n g
### Application For Remittance

Tarikh/Date : 8/5/09

**Maybank**

| | | |
|---|---|---|
| ☐ Cek Juruband/Banker's Cheque | ☐ Arahan Pembayaran/Payment Order (PO) | ☐ Region Link |
| ☐ TEMPATAN/LOCAL | ☐ Deraf Setara/Demand Draft | ☐ Pemindahan Wang Asing/Foreign Funds Transfer | ☐ Lain-lain/Others |
| ☐ LUAR NEGARA/FOREIGN | ☐ Pindahan Telegraf/Telegraphic Transfer (TT) | ☐ Kiriman Wang Melalui Sistem GIRO antara Bank/Remittance via Interbank GIRO System |

| Pemohon/Applicant | Penerima/Beneficiary | Bank/Cawangan Penerima (jika ada)/Bank/Branch of Beneficiary (if applicable) |
|---|---|---|
| Nama/Name Sarku Engineering Services s/B | Nama/Name Japaul oil & maritime Service PLC | Nama/Name Standard chartered bk |
| Pekerjaan/Occupation | Pekerjaan/Occupation | No. Akaun (jika ada)/A/C No. (if any) 011-7060-000 |
| No. KP/Pasport/IC No./Passport | No. KP/Pasport/IC No./Passport | |
| Nama/Address P.O. Box 1319 98008 miri Sarawak | Nama/Address | Alamat (jika ada)/Address (if any) |
| | | Pekan, Bandar/Town, City |
| No. Telefon/Tel. No. | | Negara/Country US |
| Tujuan Pembayaran Purpose of Payment | | Lain-lain Butir (jika ada)/Other Details (if any) |

| LUAR NEGARA / FOREIGN | | | | TEMPATAN / LOCAL | |
|---|---|---|---|---|---|
| *Jumlah yang akan dikirim/tunai kepada penerima *Amount to be remitted/received to beneficiary | Jumlah Kos/Total cost | RM | SEN | Jumlah Kini/Total cost | SEN |
| Mata Wang/Currency (sila sebut/state reverse) USD | Jumlah Kiriman Wang Remittance Amount | 410,359 | 33 | Jumlah Kiriman Wang Remittance Amount | |
| | Komisen Commission | | | Komisen Commission | |
| Amaun/Amount 396,224.00 | Bayaran Pos Postage | | | Bayaran Pos Postage | |
| | Duti Setem Stamp Duty | | | Duti Setem Stamp Duty | |
| Kadar/Rate 3.5595 | Kos Kabel Cost of Cable | 25 | 00 | Kos Kabel Cost of Cable | |
| No. Kontrak Tukaran, kalau khas sahaja Exchange contract no., special only | Fi Perkhidmatan Service Fee | | | Fi Perkhidmatan Service Fee | |
| | Jumlah/ Total | | | Jumlah/ Total | 8/c 490 @ 3.5730 25.00 |

Ruangan ini hendaklah dilengkap mengikut Akta Kawalan Pertukaran Wang, 1953 (bagi urusan pemastautin kepada bukan permastautin sahaja)
This section is to be completed under Exchange Control Act 1953 (for resident to non-resident transactions only)

| PEMOHON/ APPLICANT | PENERIMA/ BENEFICIARY | |
|---|---|---|
| ☐ Pemastautin Resident ☐ Bukan Pemastautin Non-Resident | ☐ Pemastautin Resident ☐ Bukan Pemastautin Non-Resident | |

i)   Bagi bayaran RM50,000.50 dan ke atas, sila isikan Borang P/Declaration Form Pembayaran/For payment RM50,000.50 and above, please fill in Form P (Payment Declaration Form).
ii)   Bagi bayaran RM5,000.50 sehingga RM50,000.49, nyatakan sebab di bawah/For payment between RM5,000.50 to RM50,000.49, indicate the reasons as below :-

| Tujuan Pembayaran Purpose of payment | ☐ (A) Barangan Goods | ☐ (B) Akaun Pelaburan/ Investment Account | ☐ (C) Urus niaga Modal/ Capital Transactions | ☐ (D) Urus niaga Khas/ Special Transaction | ☐ (E) Pindahan Semasa Current Transfer |

Sila jelaskan tujuan pembayaran ** lihat keterangan di sebelah/salinan pelanggan (salinan warna biru)
Please specify purpose of payment ** see reverse to customer (blue copy)          (Kod sahaja/Code only)

Saya/Kami telah baca dan faham tentang syarat-syarat dan peraturan yang tercatat di sebelah. Dengan hal yang demikian segala risiko dan tanggungjawab terhadap permohonan ini adalah tanggungan saya/kami sepenuhnya. Sedari itu, sila lakukan/kirimkan seperti butiran yang tersebut di atas.
For my/our account and risk and without responsibility or liability to yourselves and subject to the Terms & Conditions set forth on the reverse which I/We have read and understood, please issue your draft/effect the transfer as specified. Payment is to be made in the following mode(s) :

| ☐ Wang Tunai/Cash | | |
|---|---|---|
| ☐ Nombor Cek/Cheque No. yang terkurang jika jumlah cek tidak mencukupi/and debit the bank charges or any shortfall (if the cheque amount is insufficient) to my/our account. | Validator RM | dan debit akaun saya/kami untuk bayaran perkhidmatan bank atau bayaran |
| ☐ Debit Akaun saya/kami/Debit my/our account no. | | |



**MIRI**

**FACSIMILE TRANSMISSION**

| To : *Suzana* | From :<br>**Miri Sales & Service Centre** |
|---|---|
| Fax No : 03- 96598589 | Fax No : 085-418450 |
| Date : 8/5/09    Time : | No. of :<br>Pages<br>(in including this page) |
| If you do not receive all pages or find them illegible, please call us ........ 085-431530 | |
| Subject : *TT advice* | |

Authorised Signatory                    Verified by:...............................

Name  :

PF No  :

SALINA KAMARUDDIN
080005